Opinion for the court filed by Circuit Judge RADER.
Dissenting opinion filed by Circuit Judge NEWMAN.
*1369 RADER, Circuit Judge.
After a bench trial, the United States District Court for the District of Massachusetts declared all of Agfa Corporation’s asserted patents unenforceable for inequitable conduct. Agfa Corp. v. Creo Prods., Inc., Civil Action No. 00-10836-GAO (D.Mass. Oct. 5, 2004) (Judgment) (judgment incorporating the trial court’s earlier Findings of Fact, Conclusions of Law and Order for Judgment dated Aug. 24, 2004 {Decision)). Agfa challenges that result and also appeals the trial court’s order granting the defendants’[1] request that inequitable conduct be tried to the court, prior to a jury trial on the other issues in the case. Agfa Corp. v. Creo Prods., Inc., Civil Action No. 00-10836-GAO (D.Mass. July 16, 2003) (Bench Trial Order). Finally, Agfa appeals the trial court’s award of attorney fees under 35 U.S.C. § 285. Judgment (incorporating the trial court’s Award of Attorneys’ Fees and Costs, dated Oct. 5, 2004 (Attorney Fees Decision)). Because the trial court did not err in any of those decisions, and because this court agrees with the trial court’s claim construction of the one disputed claim term, this court affirms.
I.
Large scale printing typically uses presses with plates made of materials such as aluminum or polyester. Conventionally, those plates are formed with a two-step method. The first step places a desired image on polyester film. The next step transfers that image to the printing plate. A light-sensitive chemical emulsion on the plate often facilitates that transfer. Mounted on the printing press, the plate then reproduces images in a conventional manner.
Unlike that conventional technique, “computer-to-plate” (CTP) systems take a desired image, which can include both written and graphic content, and transfer that image directly from a computer onto the plate. These plates made with a CTP system then substitute for conventionally formed plates. CTP systems offer clear advantages over conventional methods of forming printing plates.
Agfa owns U.S. Patent Nos. 5,655,452 (the ’452 patent); 5,738,014 (the ’014 patent); 5,788,455 (the ’455 patent); 5,791,250 (the ’250 patent); 5,992,324 (the ’324 patent); and 6,000,337 (the ’337 patent). Those patents claim various features of Agfa’s CTP system, i.e., its “Galileo” system. As taught in the asserted patents, Agfa’s Galileo system further improves CTP automation by facilitating the creation of multiple plates of different sizes. Agfa’s patents all feature the same specification and drawings. Figure 1 of the ’452 patent, reproduced below, is representative of Agfa’s patented system.
*1370 [[Image here]]
As shown in that figure, CTP system 10 includes a computer 12 and image processor 14 linked to a platesetter 16. The platesetter includes a plate handler 18 having a number of cassettes 24, which include stacks of plates 26. During operation, the handler 18 can move the cassettes up or down such that a “picker” 28 can access any particular individual plate. Each cassette can include up to 100 plates, each separated from the adjoining plates by a protective “slip sheet,” which is automatically removed by a slip sheet removal mechanism 25. While each cassette contains plates of the same size, plate size can differ from cassette to cassette. Thus, during operation, the “picker” can change plate size by selecting a different cassette.
Because the plates are light sensitive, an operator loads the cassettes in a darkroom. After receiving the cassettes, the system operates without human intervention. The system selects a plate and transfers it to the imaging engine 22. The imaging engine prints an image directly onto the plate. The claim construction dispute in this case, however, concerns the plate handler 18. More specifically, as discussed below, the claim construction dispute concerns the meaning of the term “stack” that appears in every asserted claim.
Agfa and Creo compete in the CTP market. Agfa sued Creo alleging that Creo’s CTP system infringed all of Agfa’s Galileo patents. As a defense, as well as a counterclaim, Creo asserted that all of Agfa’s Galileo patents are unenforceable due to Agfa’s inequitable conduct before the United States Patent and Trademark Office (PTO). According to Creo, Agfa wrongfully declined to disclose material prior art to the PTO during prosecution of Agfa’s as *1371 serted patents. Specifically, Creo contended that Agfa did not disclose at least three prior art systems, the Creo Plateset-ter 3244, the Barco LithoSetter, and the Gerber Cressent/42. Creo further asserted that this prior art was more relevant to Agfa’s applications than the single reference discussed in the specification common to all of Agfa’s applications, a U.S. Patent on computer-to-film printing. Decision, slip op. at 24-25.
The district court severed the inequitable conduct issue from the rest of the case, and, over Agfa’s objection, conducted a bench trial on that issue. At the conclusion of that trial, the district court declared all of Agfa’s patents unenforceable. The district court further concluded that Agfa’s inequitable conduct rendered the case exceptional and awarded attorneys’ fees under 35 U.S.C. § 285.
II.
“The constitutional question of whether a party is entitled to a jury trial is a question of law,” subject to review without deference. Tegal Corp. v. Tokyo Electron Am., Inc., 257 F.3d 1331, 1339 (Fed.Cir.2001). In this appeal from a bench trial on inequitable conduct, this court reviews the trial court’s findings of materiality and intent, the underpinnings of inequitable conduct, for clear error. Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd., 394 F.3d 1348, 1351 (Fed.Cir.2005) (citing Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 872 (Fed.Cir.1988)). This court reviews the ultimate determination of inequitable conduct for an abuse of discretion. Id. The trial court’s claim construction, part of its materiality determination, receives plenary review. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc). An award of attorney fees under 35 U.S.C. § 285 involves a two-part determination. This court reviews the trial court’s decision to declare the case exceptional for clear error. Forest Labs., Inc. v. Abbott Labs., 339 F.3d 1324, 1328 (Fed.Cir.2003). Where a trial court has found a case exceptional, its decision to award attorney fees under § 285 is reviewed for an abuse of discretion. Id. (citing Cybor, 138 F.3d at 1460).
A. JURY TRIAL ISSUE
Procedurally, this case is almost indistinguishable from Gardco Manufacturing, Inc. v. Herst Lighting Co., 820 F.2d 1209 (Fed.Cir.1987). In Gardco, the plaintiff sought a declaratory judgment on the asserted invalidity, unenforceability, and non-infringement of a patent. Id. at 1210. In the unenforceability and invalidity accusations, the prior art was the defendant-patentee’s own prior products, which were not disclosed to the PTO during examination. See id. at 1211, 1213. The defendant counterclaimed for infringement and demanded a jury trial. Id. The trial court in Gardco then separated the inequitable conduct issue for trial without a jury. At the same time, the district court postponed for later, if necessary, a jury trial on infringement and invalidity. Id. at 1210. The bench trial on inequitable conduct determined that the asserted patent was not enforceable. Id. For that reason, the trial court did not impanel a jury.
Gardco differs from this case in only two ways. Due to the declaratory judgment posture, the Gardco parties were arranged differently, i.e., with the accused infringer as plaintiff rather than defendant. Gardco also featured inequitable conduct as a separate claim rather than as a defense to *1372 infringement. Neither of those differences has any bearing on the question of the right to a jury trial. See In re Tech. Licensing Corp., 423 F.3d 1286, 1288, 1291 (Fed.Cir.2005) (right to jury trial is examined without regard to the alignment of the parties or the posture of the issue, i.e. a defense or separate claim). Thus, this court confronts the same situation that Gardco presented nearly twenty years ago. At that time, this court sustained the trial court’s approach. Gardco, 820 F.2d at 1213. This court, as it must, sustains the Gardco reasoning in this case. Nevertheless, Agfa presents two distinct reasons for this court to depart from Gardco. This court declines that invitation.
In the first place, contrary to Agfa’s assertion, Gardco is consistent with Supreme Court precedent. In Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), the Supreme Court explained that a trial judge could not conduct a bench trial (and preclude a jury trial) on equitable declaratory relief claims where that trial would resolve “common” issues with a claim subject to jury resolution. 359 U.S. at 503-04, 79 S.Ct. 948. In Beacon Theatres, the declaratory judgment plaintiff sought to raise essentially the same antitrust issues for which the declaratory judgment defendant sought a jury trial. Id. The Supreme Court declined to limit the declaratory judgment defendant’s jury trial rights solely “because Fox took advantage of the availability of declaratory relief to sue Beacon first.” Id. at 504, 79 S.Ct. 948. Beacon Theatres specifically noted that both the petitioner’s claim and the declaratory relief claim involved “a common issue.” Id.
This case involves issues of inequitable conduct (including the materiality of the undisclosed prior art) and validity. Although these issues overlap to some degree, they are not “common” issues as in Beacon Theatres. Because this case does not involve “common” issues, this court need not apply the Beacon Theatres rule to honor Agfa’s jury trial request. Beacon Theatres did not use the term “overlapping.” While the inequitable conduct and validity questions in this case overlap in the consideration of some aspects of the same relevant evidence, they do not involve a common issue. As Gardco explained:
The simple fact is that a patent may be valid and yet be rendered unenforceable for misuse or inequitable conduct. Similarly, a valid patent may be (in the abstract) infringed, that is, the accused device may fall within the scope of the claim, but there will be no liability to the patentee when the patent is unenforceable. Thus the eonduct-of-the-applieant-in-the-PTO issue raised in the nonjury trial and the separated infringement/validity issues are distinct and without commonality either as claims or in relation to the underlying fact issues.
820 F.2d at 1213 (footnote and emphasis omitted).
This Gardco reasoning governs even in the face of 37 C.F.R. § 1.56(b). In that regulation, the PTO defines materiality as including information that establishes “a prima facie case of unpatentability.” 37 C.F.R. § 1.56(b)(1). Even though the definition of materiality, i.e., “a prima facie case of unpatentability,” may implicate some aspects of a validity analysis, the issues of invalidity and materiality are still not common within the legal construct of Beacon Theatres. As Gardco explained, a patent may be valid but not enforceable. Thus inequitable conduct and validity are *1373 not “common” issues as Beacon Theatres applied that concept.
Moreover this court’s recent decision in Digital Control, Inc. v. Charles Machine Works, 437 F.3d 1309, 1316 (Fed.Cir.2006), explained that the PTO’s Rule 56 did not supplant the earlier, and arguably broader, “reasonable examiner” standard for materiality. Digital Control suggests as well that material prior art need not even be invalidating prior art. Thus, under the reasonable examiner standard, material prior art need not necessarily present a prima facie case of unpatentability. See id. at 1315 (Information is material “where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.”) (quoting an older version of Rule 56). Because the materiality of prior art is distinct from validity issues (without even considering the additional intent requirement for inequitable conduct), this court’s earlier reasoning in Gardco remains sound. Materiality, therefore, does not present common issues with validity. Because the issues are not “common,” the Beacon Theatres rule does not apply to protect Afga’s jury trial request.
Finally, Gardco explicitly considered and commented on the Supreme Court’s decisions, including Beacon Theatres and the later decisions relating to inequitable conduct factors and validity factors. This panel could not depart from Gardco’s reasoning even if it accepted the suggestion that materiality and validity present a common issue, which it does not.
In sum, although this case involves both issues of inequitable conduct and validity, the decision to hold a bench trial on inequitable conduct does not preclude the trial court’s later grant of a jury trial. The Beacon Theatres case does not mandate that these are “common issues” that must be tried to a jury.

Scire Facias

Next, contrary to Agfa’s contentions, Gardco is consistent with some dicta in a footnote in In re Lockwood, 50 F.3d 966 (Fed.Cir.1995), vacated, 515 U.S. 1182, 116 S.Ct. 29, 132 L.Ed.2d 911 (1995). In Lockwood, this court confronted a request for a jury trial in an action involving the validity of two patents. Id. at 968. Lockwood explained that “[t]he thrust of the [Seventh] Amendment was to preserve the right to jury trial as it existed in 1791.” Id. at 971. After citing Tull v. United States, 481 U.S. 412, 417, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), for the proposition that the “Seventh Amendment ‘require[s] a jury trial on the merits in those actions that are analogous to ‘Suits at common law,’ ’ ” Lockwood discusses the writ of scire facias. 50 F.3d at 972, 974 n. 9. In that discussion, the court remarks that “[t]he contemporary analog of the writ is ... an action for a declaration of unen-forceability due to inequitable conduct not due to invalidity.” Id. at 974 n. 9. This court in Lockwood next states that actions corresponding to a writ of scire facias would give rise today to the right to a jury trial. Id. Thus, in its footnote 9, Lockwood seemed to suggest that inequitable conduct is analogous to a writ of scire facias, and because that writ would have ultimately been decided by a jury in 1791, it was wrong for the trial court to decide the inequitable conduct issue without a jury. On close inspection, however, this commentary in Lockwood does not disturb the Gardco reasoning.
Admittedly, Lockwood’s analysis is easy to misread for the proposition that a writ of scire facias is the historic analog of *1374 inequitable conduct. Lockwood, however, did not speak in terms of historic analogs to inequitable conduct, it instead spoke of inequitable conduct as a potential “contemporary analog” to scire facias. Id. Lockwood was not examining inequitable conduct with an eye toward the right to a jury trial in 1791, rather this court explained that a writ of scire facias was not so analogous to invalidity as to require a jury trial. The footnote in Lockwood noted the language in older opinions suggesting that the writ “was used to attack fraudulently obtained patents,” id., and, then suggested in passing that inequitable conduct may serve as a better modern analog for the ancient writ.
This court’s use of the word “analog” in the footnote was unfortunate. In re Technology Licensing made the same point, but with language less steeped in Seventh Amendment jurisprudence. See 428 F.3d at 1290 (“The court in Lockwood specifically stated that a proceeding on a writ of scire facias was not analogous to a suit for a declaration of invalidity, but was more akin to an action for inequitable conduct.”) (emphasis added, citation omitted). A closer analysis than was needed in Lockwood reveals that a writ of scire facias was not, in fact, a suit at common law analogous to modern inequitable conduct.
In eighteenth-century England, patents did not undergo an examination, at least as “examination” proceeds in modern patent systems. See Edward C. Walterscheid, The Early Evolution of the United States Patent Law: Antecedents (Part 4), 78 J. Pat. Trademark Off. Soc’y 77, 83 (1996). Instead, the Sovereign granted patents based solely on a petition and sworn affidavit from the inventor. In modern terms, the early English patent system was a registration system. See id. at 83-84. Without examination, nearly every defect in a patent resulted from some false representation made by the patentee. See W.M. Hindmarch, A Treatise on the Law Relative to Patent Privileges for the Sole Use of Inventions: And the Practice of Obtaining Letters Patents for Inventions 230 (I.G. M’Kinley & J.M.G. Lescure 1847) (“[I]t is the duty of every one obtaining a grant from the Queen, to see that she is correctly informed respecting the grant. [Ifj the Queen has been deceived in any material particular, by a false representation or suggestions of the grantee, the patent will be wholly void.”) (citations omitted).[2] For example, the early English system would require a patentee to attest that the invention was a genuinely new improvement, not already in the public domain. If the evidence later showed the contrary, the court would characterize this defect as a misrepresentation rather than as anticipation, the modern label for the same defect. See id. at 164 (“Patentees ... must have represented to the Crown that their inventions were such improvements ... and if their inventions were not such improvements as represented ... their patents are void by reason of the false representation or suggestion made to the Crown.”) (footnote omitted). Thus, while “fraud” reasonably describes the various bases for voiding eighteenth century patents, the actual history discloses that the conduct of the patentee was not the *1375 focus of a decision to void a patent.[3] Finally, a litigant in England in the eighteenth century could also defend against patent infringement by raising the grounds for voiding a patent through a writ of scire facias without seeking the writ at all. Compare id. at 162 (“In an action brought upon a patent[,] objections may be taken to it [including] that the Queen has been deceived in some material particular.”) with id. at 231 (“The various objections which can be taken to a patent for an invention, by a person against whom the patentee may institute legal proceedings, have already been considered; and the law provides a remedy for the public by action of scire facias, in which similar objections may be taken ....”) (citation omitted).
In sum, while a writ of scire facias might be more akin to inequitable conduct than to invalidity, it certainly is' not an historic analog that would trigger a Seventh Amendment right to a jury trial. This court has consistently treated inequitable conduct as an equitable defense that may be adjudicated by the trial court without a jury. Gardco remains the law of this circuit and governs this case.
Contrary to the dissent’s analysis, this court today does not decide that the factual issues underlying a charge of inequitable conduct must be adjudicated by a judge.. Thus,- the dissent’s observation that juries sometimes render verdicts on unenforceability issues Is entirely consistent with this court’s decision. The court today merely confirms what has been the law at least since Gardco: a judge retains the discretion to conduct a bench trial on the equitable issue of unenforceability in the same case where invalidity is to be tried to'a jury.-
B. INEQUITABLE CONDUCT
1. Claim Construction
To reach inequitable conduct, the trial court necessarily construed the claims. According to Agfa, the trial court misconstrued the term “stack,” common to all asserted claims. As a representative example of the-asserted claims, claim 1 of the ’452 patent recites:
1. A method for automatically selecting a plate for imaging in an automated plate hándler, comprising the steps of:
a. automatically positioning a plurality of stacks of plates stored in the plate handler and placing a stack of the plate size required for an imaging job in an access position;
b. automatically separating and removing a single plate from the stack of plates in -the access position and transferring the single plate out of the plate handler for imaging; and
*1376 c. automatically removing a slip sheet from on top of the stack of plates in the access position.
’452 patent, col. 11, 1. 66-col. 12, 1. 11 (emphasis added). Agfa argues that the term “stack” covers only a horizontal arrangement of plates, like those shown in figure 1 of the ’452 patent, reproduced above. The trial court disagreed, construing stack as “encompassing a number of plates arranged together in an orderly fashion, regardless of the orientation (horizontal or vertical) of the collection as a whole.” Decision, slip op. at 22. This court perceives that the trial court’s construction, and its reasoning leading to that construction, is sound.
The trial court first consulted the ordinary meaning of “stack,” for which it cited a dictionary definition. As this court explained in Phillips v. AWH Corp., the ordinary meaning of some claim terms “may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of widely accepted meaning of commonly understood words.” 415 F.3d 1303, 1314 (Fed.Cir.2005) (en banc) (citation omitted). “In such cases, general purpose dictionaries may be helpful.” Id. This case falls squarely within those guidelines from Phillips. The customary meaning within this field of art does not limit the term “stack.”
The meaning of the claim language does not limit “stack” to plates arranged one on top of another. Accordingly, when a stack is tilted more than 45 degrees, it remains a stack because the plates are still arranged in a top-to-bottom fashion. After all, the top of a plate remains its top even when that plate tilts beyond 45 degrees. In other words, the relationship of plates in a stack depends on the orientation of those plates relative to one another. The orientation of the resulting stack from the vantage point of elements outside the stack is irrelevant.
Moreover, nothing in the disclosures of the asserted patents suggests that “stack” has any meaning in the art that would limit its scope to horizontal stacks. The trial court buttressed its construction with the observation that three of the asserted patents include dependent claims that further specify a horizontal (or other particular) arrangement of the claimed stacks. See, e.g., ’250 patent, col. 12, ll. 16-18 (claim 2) (“The method according to claim 1, wherein the stacks of plates stored in the plate handler are positioned substantially horizontally.”). Properly applying the claim differentiation guideline in the context of dependent claims, the trial court correctly found support for the proposition that those dependent claims suggest that the “stack” standing alone is not limited to horizontally positioned stacks. See Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed.Cir.2006) (explaining the presumption that independent claims do not include the limitations added by their dependent claims).
Similar to this court in Phillips itself, the trial court declined to limit these patent claims to their preferred embodiment. The asserted patents indeed depict a horizontal arrangement of stacks as the preferred embodiment. See, e.g., ’452 patent, figure 1 (reproduced above; elements 26 are the stacks). As noted, this court has repeatedly rejected the contention that depiction of a single embodiment in a patent necessarily limits the claims to that depicted scope. See Phillips, 415 F.3d at 1323. This case illustrates again the reason for this court’s refusal to limit broader claim language to a preferred embodiment in the patent specification. Of necessity, any de *1377 piction of any stack -will necessarily show that stack arranged in a particular manner. Nothing beyond that depiction, however, limits the claim language — the defining portion of the patent document — to some particular orientation. Without any indication beyond the necessary depiction to suggest limiting the invention to this single embodiment, the broader language of the claims cannot carry that unexpressed and unintended (at the time of patent drafting) limitation.
2. Materiality
Unenforceability due to inequitable conduct requires proof of materiality and intent by clear and convincing evidence. Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 872 (Fed.Cir.1988). Upon finding evidence that satisfies a threshold measure of materiality and intent, the trial court then weighs that evidence to determine that the equities warrant a conclusion of inequitable conduct. Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed.Cir.1995). In evaluating materiality, the trial court followed the standard set forth in PTO Rule 56. That rule considers information material to patentability when:
[I]t is not cumulative to information already of record or being made of record in the application, and
(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
(2) It refutes, or is inconsistent with, a position the applicant takes in:
(i) Opposing an argument of unpa-tentability relied on by the Office, or
(ii) Asserting an argument of patenta-bility.
37 C.F.R. § 1.56(b) (2004). The trial court found that the information withheld by Agfa satisfied both parts (1) and (2) of that rule. With respect to prima facie unpa-tentability, part (1) of Rule 56, the trial court focused on prior art CTP systems, patents, and brochures. This prior art, taken alone or in combination, established a prima facie case of unpatentability for claims in each of Agfa’s asserted patents. The primary challenge to the trial court’s materiality finding was that an incorrect claim construction caused error in findings of materiality. Because, as discussed above, the trial court’s claim construction was correct, these challenges of error fail.
The trial court also found that the undisclosed prior art was inconsistent with Agfa’s position during examination, and so was also material under part (2) of Rule 56. Decision, slip op. at 45. During examination of two of Agfa’s applications, the examiner requested clarification about the CTP technology described in the Background sections. In particular, the examiner wished to know what aspects of the CTP technology described in the Background were actually conventional. The trial court found that Agfa’s responses to the examiner “were misleading in light of all the information [the patent agent’s] had about the Undisclosed CTP References .... Indeed, [one of the patent agents] admitted that he could not have made the arguments he did make in response to the Examiner’s request if he had disclosed the Creo Platesetter 3244 or the Barco Litho-Setter ....” Id.
On appeal, Agfa responds that Rule 56 “does not provide that a ‘misleading’ statement is material.” Appellant’s Brief at 56. This contention belies the weakness of Agfa’s position. The trial court did not find that the misleading statements were *1378 material. Instead, the trial court found that undisclosed prior art was material because it was inconsistent with Agfa’s misleading statements to the examiner during prosecution.
3. Intent
Turning to intent, the trial court found abundant evidence from which to infer Agfa’s culpable intent. Decision, slip op. at 41-45. For example, the evidence regarding Agfa’s knowledge of the Creo Platesetter 3244 was overwhelming: senior Agfa employees, including an inventor named on all the asserted patents and the agents who prosecuted the applications, attended an exposition put on by Agfa at which Creo’s product was displayed; Agfa and Creo entered into a reseller agreement under which Agfa agreed to sell Creo’s platesetter outside the United States; and Agfa distributed brochures describing Creo’s products. Id. slip op. at 4-5. In the words of the trial court, “[i]t was widely known within Agfa, including among the engineering and patent departments, that Agfa was selling Creo’s Platesetter 3244, and that Creo was a significant player in the field of CTP output devices.” Id. slip op. at 5. In addition to Agfa’s particular familiarity with Creo’s platesetter, the trial court explained that Agfa was well aware of other CTP prior art. According to the trial court, during development of the Galileo project, Agfa kept a spreadsheet entitled “Overview of [CTP] Products.” Id. slip op. at 7. The inventors common to all Agfa’s asserted patents possessed that spreadsheet, including its information on the Creo Platesetter 3244, the Barco Lithosetter, and the Gerber Crescent/42. Id. Based on Agfa’s extensive knowledge of the prior art, the trial court reasoned that “[Agfa’s] failure to disclose information about [the various] CTP systems to the [PTO] supports an inference of intent to deceive because pat-entability arguments could not have been made had the withheld information been disclosed.” Id., slip op. at 42.
Both the evidence and the law support the trial court’s intent determination. This court has held that a trial court may infer deceptive intent based on a showing that a patentee withheld references with which it was intimately familiar and which were inconsistent with its own patentability arguments to the PTO. GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1275 (Fed. Cir.2001) (citing LaBounty Mfg., Inc. v. United States Int’l Trade Comm’n, 958 F.2d 1066, 1076 (Fed.Cir.1992)). “[A] pat-entee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish subject good faith sufficient to prevent the drawing of an inference of intent to mislead.” Id. (internal quotes and citation omitted).
On appeal, Agfa questions the trial court’s intent finding based on its claim construction argument. Specifically, Agfa argues that regardless of the proper meaning of “stack,” it understood that term as applying only to horizontal stacks. Accordingly, Agfa contends that it should not be charged with knowledge of materiality under a claim construction it did not anticipate. Without knowledge of materiality, Agfa argues, the trial court cannot properly infer intent.
To the contrary, the trial court found Agfa’s assertion that its patent agents did not appreciate the materiality of the undisclosed references, or that they unintentionally withheld those references, not credible. Specifically, the trial court relied on the substantial documentation and internal discussions of those references in the de *1379 sign and creation of the Galileo system. This court must defer heavily to the trial court’s credibility determinations. JVW Enters., Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1334 (Fed.Cir.2005) (“[Credibility determinations by the trial judge can virtually never be clear error.”) (citations and internal quotes omitted).
In addition, Agfa’s claim construction argument seems to assume that it had no obligation to submit prior art that did not include horizontal stacks. In Agfa’s words: “[wjhen stack is given its ordinary meaning of objects placed one on top of another, the CTP references that disclose vertically-oriented plates clearly do not establish a prima facie case of anticipation.” Appellant’s Brief at 39 (emphasis added). Thus, Agfa seeks to confine the material references that support an intent finding to only those references that anticipate the claimed invention. Materiality is not synonymous with anticipation, but instead embraces the broader concept of patentability. Thus, even if Agfa’s assertions about its understanding of “stack” during prosecution were accepted, the undisclosed prior art would still have been material because some, but not all, of that art included horizontally arranged stacks. See id. at 40.
With respect to the ’324 patent, that patent is a continuation of the ’014 patent, about which the district court made specific findings. Thus, Fox Industries, Inc. v. Structural Preservation Systems, Inc., 922 F.2d 801 (Fed.Cir.1990), supports the trial courts decision regarding the ’324 patent. Fox Industries explains that inequitable conduct “early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application.” Id. at 804. Later applications are, of course, not always tainted by the inequitable conduct of earlier applications. See Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1332 (Fed.Cir.1998) (“[W]here the claims are subsequently separated from those tainted by inequitable conduct through a divisional application, and where the issued claims have no relation to the omitted prior art, the patent issued from the divisional application will not also be unenforceable due to inequitable conduct committed in the parent application.”). The ’324 patent is a continuation, not a divisional, of the ’014 patent. Furthermore, Agfa has not suggested that the ’324 patent claims subject matter sufficiently distinct from its parent to preclude the trial court’s inequitable conduct determination. Thus, the trial court’s inequitable conduct analysis properly included the ’324 patent.
4. Balancing
Beyond the trial court’s findings of materiality and intent, Agfa also challenges the trial court’s inequitable conduct determination based on those findings. Agfa’s argument is that, notwithstanding its detailed inequitable conduct analysis, the district court did not perform a balancing of materiality and intent. This court, however, has no doubt that the district court perceived this to be a case of intentional, large scale, inequitable conduct. “The inequitable conduct established by the evidence here was not incidental or sporadic, but thoroughgoing.” Decision, slip op. at 49. The district court paints a picture of a group of engineers and patent agents who set out to design their own version of their competitors’ products by attending trade shows and reviewing literature, all the while taking notes and holding meetings to decide which features from which printing presses would work well in Agfa’s Galileo system. Those same agents *1380 then prepared and prosecuted the asserted patents, never sharing with the PTO any of the information they had compiled about the products upon which they modeled their system. The trial court thus found high levels of both materiality and intent, and did so with respect to numerous undisclosed pieces of prior art. In such a case, the trial court did not err by issuing its opinion without an express and detailed balancing analysis.
Hoffmann-La Roche, Inc. v. Promega Corp., 323 F.3d 1354 (Fed.Cir.2003), also supports this result. In Hoffmann-La Roche, this court explained the importance of determining “whether the material mis representations or omissions in question are sufficiently serious in the light of the evidence of intent to deceive, to warrant the severe sanction of hold Hoffmann-La Roche, this court remanded both because this court had not upheld all of the grounds for unenforceability and because the trial court had not addressed the weight of the various findings of materiality and intent. Id. In this case, however, this court has upheld the trial court’s findings of high levels of both materiality and intent. With those findings firmly established in this case, the district court’s less express balancing sufficed. In this setting, Hojfmann-La Roche does not require more.
C. ATTORNEY FEES
Finally, because this court affirms the trial court’s decision, Agfa’s argument regarding the award of attorneys’ fees fails. In the words of the trial court: “Even among the subset of ‘inequitable conduct’ patent cases, this one must be considered exceptional.” Decision, slip op. at 49. This court affirms the trial court’s award of those fees.
CONCLUSION
Because the trial court properly relied on this court’s Gardco decision when it held a bench trial on inequitable conduct, and because Agfa has not shown that the trial court committed any errors during that bench trial, this court affirms.
COSTS
Each party shall bear its own costs.

AFFIRMED.

. The defendants, now appellants, include: Creo Prducts, Inc., Creo, Inc., CreoScitex America Corp., CreoSSU Inc., Scitex Corp. Ltd., Scitex Development Corp., and Scitex America Corp. The court will collectively refer to these parties as “Creo.”

. Hindmarch is an American reprinting of the original British version. While the date of the publication is 1847, its discussion and analysis, particularly with respect to scire facias, includes citations to opinions issued during the mid-to-late eighteenth century, i.e., at a time relevant to a Seventh Amendment analysis.

. Even if ‘'fraud” was perfectly synonymous with the grounds for voiding an eighteenth century patent, it is not the equivalent of today's inequitable conduct defense. Common law fraud is not synonymous with the broader concept of inequitable conduct. See Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1069 (Fed.Cir.1998). Fraud has a number of indispensable elements: (1) a representation of a material fact, (2) the falsity of that representation, (3) the intent to deceive (or an equivalent recklessness), (4) justifiable reliance by the deceived party, and (5) injury to the deceived party. Norton v. Curtiss, 57 C.C.P.A. 1384, 433 F.2d 779, 792-93 (1970). As noted above, intent was not relevant to the decision to void a patent in eighteenth century England, but rather the more- standard doctrines of patentability applied. By the same token, reliance and injury are not elements of today's inequitable conduct defense. Thus, while the label "fraud” may loosely cover both scenarios, they are nevertheless distinct.