**METSO MINERALS, INC., Plaintiff,**

v.

**POWERSCREEN INTERNATIONAL DISTRIBUTION LIMITED, Terex Corporation, Powerscreen New York, Inc. and Emerald Equipment Systems, Inc., Defendants.**

No. 06–cv–1446 (ADS)(ETB).

United States District Court, E.D. New York.

Jan. 28, 2010.

Cohen, Pontani, Leiberman & Pavane LLP, by Michael C. Stuart, Esq., Lisa Ferrari, Esq., Of Counsel, New York, NY, for plaintiff.

Squire Sanders & Dempsey LLP, by George B. Yankwitt, Esq., Andrew H. Fried, Esq., Mary Margaret Chang, Esq., Of Counsel, New York, NY, for all defendants.

Clauss & Sabatini, PC, by Ava R. Maynard, Esq., Of Counsel New York, NY, for defendant Terex Corporation.

Forchelli, Curto, Schwartz, Mineo, Carlino & Cohn, LLP, by Andrew E. Curto, Esq., Of Counsel, Mineola, NY, Attorneys for defendant Powerscreen New York, Inc.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This patent infringement case involves industrial machines, called "screeners", used primarily at construction sites to sort rock or other rubble into various piles of similarly-sized debris. The patent at issue is United States Patent 5,577,618 ("the '618 patent"), which comprises an improvement on a screener so that the machine may be more readily compacted for transport from site to site. The plaintiff Metso Minerals, Inc. ("Metso") alleges infringement of this patent by the defendants Powerscreen International Distribution Limited ("Powerscreen"), Terex Corporation ("Terex"), Powerscreen New York, Inc. ("PSNY"), and Emerald Equipment Systems, Inc. ("Emerald"). The defendants have answered and counter-claimed for a declaratory judgment of non-infringement. Currently before the Court are (1) the plaintiff's and the defendants' motions for claim construction, (2) the plaintiff's motion to preclude the defendants from asserting new defenses and from relying upon new evidence, and (3) the plaintiff's and the defendants' motions for summary judgment. Upon construction of the relevant claims, and for the reasons set forth below, the Court (1) grants in part and denies in part the plaintiff's motion to preclude and exclude, (2) grants in part and denies in part the plaintiff's motion for summary judgment, and (3) denies the defendants' motion for summary judgment.

## I. FACTUAL BACKGROUND

United States Patent 5,577,618 was granted to Malachy J. Rafferty on November 26, 1996 for a "mobile aggregate material processing plant". The patent covers an invention whose primary function is to sort debris—usually construction debris—into piles of like-sized particles. Figure 2, below, is a cross sectional drawing from the '618 patent showing the invention's preferred embodiment.

*Fig. 2*

In this preferred embodiment, the plant sits on a structure akin to a flat-bed trailer, and extends the length of the trailer. When in its operating position, the plant takes mixed debris into an input hopper, and separates the debris into one of four size groupings. The largest debris is then dumped out of the input hopper, while the remaining three groupings are placed on one of three conveyors. Two of these conveyors extend out from the sides of the plant (called "lateral conveyors"), while the third extends from the back end of the plant. The debris travels the length of these conveyors, and is dumped at the end of each to form three separate piles, each of like-sized debris. In Figure 2, above, the lateral conveyors [20] are shown in their operative position, extending out from the plant base.

All of these functions, however, are incorporated into the prior art that preceded the '618 patent. The primary innovation claimed in the '618 patent is a way of folding the lateral conveyors so that the plant is more easily transported from worksite to worksite. Previous plants were transportable, but they were arguably less practical. For example, one cited invention required the lateral conveyors to be manually removed from the plant and stored above it for transport. Others allowed the lateral conveyors to fold onto the plant, but required that the plant be of sufficient length to accommodate the full size of the conveyors. By contrast, the '618 patent describes an invention whereby the lateral conveyors are double-jointed and fold into the plant more compactly. This is the essence of the innovation.

In exchange for the inventor's disclosure of this innovation, the United States Patent and Trademark Office issued the '618 patent, in which the patentee claimed, among other things:

A mobile road-hauled aggregate material processing plant comprising: a wheel mounted chassis extending in a longitudinal direction;

a plant support frame mounted on the chassis;

a raw material input hopper mounted on the plant support frame;

a material processing means mounted on the plant support frame and fed from the input hopper and having an outlet;

a processed material outfeed delivery means mounted on the plant support frame and fed from the material processing means;

at least one lateral delivery conveyor incorporated in the outfeed delivery means, said conveyor comprising:

a conveyor frame tail section;

a conveyor frame head section;

a tail articulation means connecting the tail section to the support frame in such a way that at least part of the tail section is movable relative to the plant support frame from an operative position extending laterally of the chassis with respect to the longitudinal direction for outfeed of processed material, to a transport position extending substantially upright above the chassis and positioned with respect to the input hopper and material processing means so that it does not project laterally beyond the chassis,

a head articulation means connecting the head section to the tail section in such a way that the head section is movable from an operative position to a transport position with the head section extending longitudinally above the chassis and positioned with respect to the input hopper and material processing means so that it does not project laterally beyond the chassis; [and]

an endless conveyor belt ..., said belt defining a conveyor plane.

('618 patent, col. 7.)

Thus, according to this description, the "wheel mounted chassis" that underlies the invention is outfitted with a "plant support frame". On the plant support frame is attached an "input hopper" that, in the preferred embodiment, accepts rubble of various sizes. This hopper feeds a "mate-rial processing means" that sorts the rubble into various sizes, and feeds the sorted material to the "outfeed delivery means." This outfeed delivery means comprises, in the preferred embodiment, two lateral conveyors extending off the sides of the plant. Each of these lateral conveyors is mounted with a conveyor belt and has two movable joints. The first joint is called the tail articulation means ("TAM"), and it connects the lower portion of the conveyor (the "tail section") to the plant support frame. In the preferred embodiment, this is done using a joint that runs parallel to the length of the support frame. Thus, the conveyor pivots up and down relative to the support frame. The second joint is called the head articulation means ("HAM"), and it attaches the top part of the conveyor (the "head section") to the conveyor's tail section. Unlike the TAM, the HAM uses a joint that is perpendicular to the surface of the conveyor. Thus, in the preferred embodiment, the HAM can pivot the head section from side to side, but it cannot pivot it up and down. However, by using these two joints together, the conveyor can be folded into a flat L shape using the HAM and raised next to the plant support frame using the TAM. This way, the conveyor sits snugly next to the plant support frame during transport mode. Figure 4, below, shows the preferred embodiment of the invention in transport mode. The lateral conveyors [20] are shown folded into the L shape for transport.

Fig. 4

On March 29, 2006, the plaintiff commenced the present infringement action against all the defendants. The plaintiff did not serve PSNY with a copy of the complaint at that time. On September 4, 2008, defendants Powerscreen, Terex, and Emerald answered with ten affirmative defenses and three counterclaims, asserting, among other things, non-infringement, obviousness, invalidity, lack of standing, and laches. On October 10, 2007, these defendants moved to amend their answer and counterclaims to assert an additional defense and counterclaim of inequitable conduct, as well as to have PSNY dismissed as a defendant based on the plaintiff's failure to serve it with the complaint. On July 1, 2008, the Court granted these defendants' motion to amend, and ordered that PSNY be served within twenty days. On July 11, 2008, Powerscreen, Terex, and Emerald then filed an amended answer and counterclaims. After being served with the complaint, PSNY then filed a substantially similar answer with counterclaims on September 9, 2008. All defendants seek a declaratory judgment of non-infringement.

The plaintiff contends that the defendant Powerscreen manufactures and markets a series of mobile screeners that infringe several claims of the '618 patent (the "Accused Screening Plants"). The plaintiff additionally alleges that Terex is liable for infringement because it is the parent company to Powerscreen, and alleges that PSNY and Emerald are liable for infringement because they distributed Accused Screening Plants in New York and elsewhere.

At the close of discovery, both parties moved for claim construction and summary judgment. The defendants' motion for summary judgment is on all claims, while the plaintiff's is for all issues except obviousness, willful infringement, and damages. The plaintiff has also moved to preclude the defendants from asserting certain defenses and to preclude certain evidence not produced during discovery.

With respect to the parties' claim construction motions, the parties have requested that the Court construe ten terms used in the '618 patent's claims. Construction of four terms was requested by both parties: "mobile, road-hauled", "chas-

sis", "wheel", and "head articulation means." Construction of five terms was requested by only the plaintiff: "processed material outfeed delivery means", "at least one lateral delivery conveyor", "material processing means", "tail articulation means", and "belt defining a conveyor plane". Construction of one term was requested only by the defendants: "does not project laterally beyond the chassis." The construction of these terms is discussed below.

As for the plaintiff's motion to preclude and exclude, the Court grants the motion in part and denies in part. Based on this and on the construed terms of the '618 patent, the Court then grants in part and denies in part the plaintiff's motion for summary judgment, and denies the defendant's motion for summary judgment in its entirety.

## II. DISCUSSION

### A. Claim Construction

#### 1. Principals of Construction

Claim construction is a question of law exclusively for the Court. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995) (*en banc*), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). In construing claims, the Court interprets each claim as it would be understood by a person skilled in the relevant art. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed.Cir.2005) (*en banc*). For terms that do not have special meaning in the field, the Court applies generally understood meanings. *Id.* However, for terms that do have special meaning in the field, the Court looks to evidence of what a person skilled in the art would understand the term to mean. *Id.*

To construe claim terms, the Court looks first for the evidence of a term's meaning in the patent and its prosecution history. *Id.* at 1303. In doing this, the Court looks first to the claim in which the term ap-

pears, and then considers the term in the context of the surrounding claims and the patent specification. *Id.* In most cases, the "best source for understanding a technical term" is the patent specification. *Id.* at 1314.

■ Generally, patent terms should be interpreted to cover the preferred embodiments set forth in the specification. *On–Line Tech v. Bodenseewerk Perkin–Elmer,* 386 F.3d 1133, 1138 (Fed.Cir.2004) ("a claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct" (internal quotations and citations omitted)). However, except for certain situations, the patent claims should not be *limited* to the preferred embodiment. *See, e.g., Agfa Corp. v. Creo Products Inc.,* 451 F.3d 1366, 1376 (Fed.Cir.2006).

■ The primary exception to these rules is the construction of terms that are expressed in the means-plus-function format described in 35 U.S.C. § 112, ¶ 6. Section 112, ¶ 6 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The Federal Circuit has set forth a two step process for construing this type of claim. First, the Court reviews the patent claim to identify the recited function for the term to be construed. *See, e.g., Callicrate v. Wadsworth Mfg., Inc.,* 427 F.3d 1361, 1368–69 (Fed.Cir.2005). Second, the Court reviews the patent specification to identify the structure or structures in the patent specification that carry out the recited function. *Id.* (citing *Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1257 (Fed.Cir.1999)). These struc-

tures, and their equivalents, are incorporated into the construction of the means-plus-function claim. *See, e.g., Callicrate,* 427 F.3d 1361 at 1369. In identifying the related structures in a means-plus-function claim, "a court may not import into the claim features that are unnecessary to perform the claimed function." *Northrop Grumman Corp. v. Intel Corp.,* 325 F.3d 1346, 1351 (Fed.Cir.2003) (citing *Acromed Corp. v. Sofamor Danek Group, Inc.,* 253 F.3d 1371, 1382 (Fed.Cir.2001)).

### 2. Construction of Terms

Although the parties here identify ten terms for construction, the Court finds that construction of only five terms is necessary for resolution of the motions for summary judgment and a proper trial of the case. These are the terms, "mobile, road-hauled", "chassis", "wheel", "head articulation means", and "does not project laterally beyond the chassis." Each of these terms is material to one of the defendants' non-infringement defenses. The remaining terms are unrelated to any of the defendants' non-infringement arguments, and therefore need not be construed.

#### a. "Mobile, Road–Hauled"

■ Both the plaintiff and the defendants request the Court to construe the term "mobile, road-hauled." This term appears in the first sentence of claim 1, in which the patentee claims "[a] mobile, road-hauled aggregate material processing plant...." The defendants request that the Court construe "mobile, road-hauled" to mean, "with a chassis mounted on wheels so that the plant can be towed or pulled along a road on its own wheels." The plaintiff opposes this definition and requests that the Court construe the term to mean, "mobile and capable of being hauled on a road, with or without any other devices." Neither party contends that "mobile, road-hauled" is a term that has special meaning within the art. Additionally, the parties agree that "road-

hauled" limits the claim to an invention that can be transported on a road.

As a preliminary matter, the Court views "mobile, road-hauled" as a term with a straightforward definition for a lay person. The term "mobile" speaks for itself, and the Court may well encroach upon the province of the jury by acting as a mere thesaurus to interpret this term. Similarly, "road-hauled", in common parlance, means "capable of being hauled on a road." The term implies no additional restriction on how something is hauled on a road.

Nonetheless, the defendants contend that the patent specification limits the scope of "mobile, road-hauled." In particular, the defendants rely on the following passage from the patent specification:

> [A screening plant's] processing capacity is heavily influenced by the ability to quickly and effectively deliver the processed material away from the plant .... [and w]hile the manner in which such lateral conveyors are connected to the plant is relatively simple, where the processing plant is mobile, major problems arise in ensuring that the overall width and height of the mobile plant is within certain dimensions when carrying such conveyors during transport.

The defendants argue that this passage demonstrates that the processing plant is described as "mobile" only in the sense that it could be transported over long distances.

The defendants also point out that the patent specification describes—both in writing and in drawings—a processing plant that is pulled on its own wheels when transported over long distances. Thus, the defendants maintain that, when the patentee described the invention as "road-hauled", he meant to limit the patent to a device that was capable of being pulled or towed on a road on its own wheels.

The Court agrees that, in the context of the entire patent, the term "mobile" refers to the plant's capacity to be moved over large distances. It is sufficiently clear to the Court that the essence of the invention was to create a screening plant that be moved among sites that are miles apart, and that the term "mobile" refers to this quality. However, the Court does not find that "road-hauled" was intended to limit the invention to a device that was towed or pulled on its own wheels. Being "towed or pulled" on its "own wheels" are qualities of the preferred embodiment of the invention, but they are not qualities that are implied by the term "road-hauled" itself, nor are they qualities that the Court views as essential to the invention. *See Agfa Corp.*, 451 F.3d at 1376 (holding that is generally improper to incorporate limitations from a patent's preferred embodiment into the patent's claims). The Court therefore construes "mobile, road-hauled" as meaning "capable of being hauled over long distances on a road, with or without other devices."

### b. "Chassis"

■ Both parties request construction of the term "chassis." This term appears in the patentee's claim that the invention comprises "a plant support frame mounted on the chassis." It also appears in the claim terms that describe the head articulation and tail articulation means as connecting the lateral conveyors such that, when folded for transport, the conveyors "do[ ] not project laterally beyond the chassis."

The defendant requests that the Court construe "chassis" to mean "a pair of longitudinal beams." The plaintiff opposes this construction, and requests that the Court construe the term to mean "a structure onto which other elements are attached or mounted." The plaintiff urges that this term should be additionally construed to include, with respect to a tire-mounted

screener, "the tire or wheel assembly (also known as a bogie) (including the tires), the support jack legs, the tire mud guards, the laterally extending fixed platforms, and the axles." With respect to a track-mounted screener, the plaintiff requests the term be construed to include the "two tracks, the driven, guide and idler wheels, the frame, the roll-in bogie (including its tires, frames and mudguards), and the support jack legs."

The defendants support their narrower construction of chassis with language from the patent specification that states that "[t]he plant 1 comprises a chassis 2 having a pair of longitudinal beams mounted on wheels 3(a) and supported on jack legs 3(b)." ('618 patent, col. 3, lns. 46–48.) The defendants read this to mean that the "chassis", identified with structure number 2, is separate from the "wheels" and "jack legs", identified with structure numbers 3(a) and 3(b), as well as the "wheel arches", identified elsewhere in the specification by structure number 33.

Further, the defendants point out that the chassis is identified in the patent's figures with a single lead line pointing to what appear to be beams running the length of the plant. *See* Figure 4 (above), structure 2. The defendants assert that this is especially significant in light of 37 C.F.R. § 1.84, the provision of the C.F.R. that regulates the figures included in a patent application. Section 1.84 provides in pertinent part:

> (q) Lead lines. Lead lines are those lines between the reference characters and the details referred to.... They must originate in the immediate proximity of the reference character and extend to the feature indicated....

> (r) Arrows. Arrows may be used at the ends of the lines, provided that their meaning is clear, as follows:

(1) On a lead line, a freestanding arrow to indicate the entire section towards which it points;

The defendants contrast structure 2, the chassis, with structure 1, the plant itself. While structure 1 is identified with an arrow to indicate that multiple elements are incorporated into it, structure 2 is identified with only a lead line, indicating, in the defendants' view, the incorporation of only the longitudinal beams. *See,* Figure 4, above.

The plaintiff contends that, notwithstanding the use of different structure numbers to identify the chassis and the wheels, the patent commonly refers to a "wheel-mounted chassis," indicating that the device's wheels are part of the chassis itself. Moreover, the plaintiff contends that, notwithstanding the patentee's use of lead lines and arrows, the drawings in the patent application show that the conveyors, when folded for transport, project well beyond the "longitudinal beams." According to the plaintiff, the chassis must comprise more than the longitudinal beams identified by the defendants because the patent states that the folded conveyor "does not project laterally beyond the chassis." The plaintiff argues that this can be seen in the depiction of the lateral conveyors, 20, in Figure 4 above. The plaintiff also cites to Figures 2 and 5, below, showing the preferred embodiment of the invention in operative and transport modes, respectively:

*Fig.2*

*Fig.5*

While Figure 2 identifies structure 2, the chassis, by pointing to the end of the longitudinal beams identified by the defendant, Figure 5 shows the collapsed conveyors extending well past these longitudinal beams to the very edge of the wheel arches, structure 33.

If possible, the Court is obligated to construe a patent so that the preferred embodiment is incorporated into the patent. *On–Line Tech,* 386 F.3d at 1138 ("a claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct" (internal quotations and citations omitted)). Here, the patent's figures show that, in the preferred embodiment, the device's conveyors extend beyond the longitudinal beams when folded for transport. According to this cannon, the Court must construe the chassis as comprising more than the longitudinal beams identified by the defendant.

Nevertheless, the defendants cite to *Hockerson–Halberstadt, Inc. v. Avia Group Intern., Inc.,* 222 F.3d 951, 956 (Fed.Cir.2000) for the proposition that, because the diagrams are apparently not drawn to scale, they cannot be used to interpret the relative dimensions of the invention. However, *Hockerson* stands only for the proposition that a court should not infer "precise proportions" and "particular sizes" from un-scaled patent drawings. *Id.* at 957. That is not what the Court is doing here. Figures 5 and 4 both plainly show the collapsed conveyor arms

extending to the very extremity of the wheel arches. This is not a "precise proportion" being shown, but rather an important component of the design. Thus, the Court finds that "chassis" must necessarily include not just the "longitudinal beams," but also the wheels and wheel arches of the invention in its preferred embodiment.

Nonetheless, there remains the more difficult question of how "chassis" should be defined more generally. The Court is wary of explicitly defining "chassis" to incorporate structures that are found only in the preferred embodiment of the invention. For similar reasons, the Court is also reluctant to explicitly construe "chassis" to include or exclude parts of the "tracks" on a "track-mounted screener." Unfortunately, the patent itself offers little in the way of generic description of a chassis, except to state that the "plant support frame" is mounted on it.

Finding the intrinsic evidence wanting, the Court finds most helpful the defendant Powerscreen's Spare Parts Listings for its mobile screeners. In its listing, Powerscreen uses the terms "track chassis" and a "wheel chassis" to refer to the entire assembly of supports, wheels, tracks, and other related parts on which would rest the other operative structures of the screening plant. (Decl. of Michael C. Stewart, Jun. 30, 2009, Ex. 29, PS 4511, 13.; Decl. of Steven A. Whyte, Jun. 29, 2009, ¶ 18.) In the Court's view, this is evidence that "chassis", as used by one skilled in the art, refers to the entire assembly that rests beneath the functional parts of the screener. The evidence is particularly probative because, unlike the plaintiff, Powerscreen has no vested interest in using "chassis" in this manner. The Court finds this extrinsic evidence to be consistent with the intrinsic evidence in the patent itself, particularly the requirement that the chassis incorporate the wheels and the wheel arches in the pre-

ferred embodiment. The Court therefore construes the term "chassis" to mean "the entire assembly of parts that rest beneath the plant support frame."

### c. "Wheel"

■ Both parties request that the Court construe the term "wheel." This term appears in the claim provision that the invention comprise "a wheel mounted chassis extending in a longitudinal direction." ('618 patent, col. 7.)

The defendants assert that "wheel" means "a circular rim with a rubber tire that revolves on an axle and rides directly on the road." The plaintiffs contend that "wheel" has the broad dictionary and "common sense" meaning of:

a circular frame of metal, wood, or other hard material that may be solid, partly solid, or spoked and that has a hub at the center for attachment to or suspension from an axle on which it may revolve and bear a load; a circular framework often with cogs or teeth on the rim used to transmit or modify force and motion in machinery or a mechanical contrivance. A wheel includes, but is not limited to, a rim on which a rubber tire is mounted, a sprocket wheel (both a driven wheel, and [a] non-driven or idler wheel) used on a track of a tracked machine, a guide wheel used on a track of a tracked machine, and an endless track of a tracked machine.

The defendants maintain that the definition of "wheel" is limited by the patent specification's provision that "the plant 1 may then be hauled along a road on the wheels 3(a)." The defendants argue that this description makes clear that "wheel" was intended to refer to a wheel that rides directly on a road. The defendants further object to the plaintiff's inclusion of an "endless track of a tracked machine" in its definition of "wheel." The defendant asserts that tracks (such as would conven-

tionally appear on a military tank) are treated as separate structures from wheels in the construction industry. Since the patentee made no reference to "tracks" in the '618 patent, tracks should not be incorporated into the definition of "wheel".

The plaintiff asserts that "wheel" has a common, non-technical, meaning, and that nothing in the patent contravenes this. The plaintiff also notes that Powerscreen's own documents refer to the track assemblies of Powerscreen's track-mounted screeners as including "wheels." (See Whyte Decl., ¶ 25.)

Neither party argues that "wheel" has a special technical meaning in the relevant art. Nonetheless, the entirety of the patent document suggests that the "wheels" on which the device is mounted must be wheels on which the device rides. The essence of the invention is that it is easily movable, and the inclusion of wheels in the design directly serves this goal. Thus, "wheel" cannot refer, as the plaintiff requests, to a "circular framework often with cogs or teeth on the rim used to transmit or modify force and motion in machinery or a mechanical contrivance."

However, the Court also rejects the defendants' definition of "wheel" as limited to a wheel that is tire-mounted and rides directly on the road. This may be the manner of wheel depicted in the preferred embodiment of the invention, but the patent claims themselves are amenable to other types of wheels. To limit the claims to tire-mounted wheels riding directly on the road would improperly import elements of the preferred embodiment into the claim itself.

The Court also rejects the plaintiff's assertion that "wheel" includes the "endless track on a tracked machine". This definition is unsupported by intrinsic or extrinsic evidence. The patent never mentions "tracks" or "tracked machines", and an endless track conflicts in several ways with the dictionary definition the plaintiffs urge for "wheel"—not the least of which is that an endless track is not "circular." The opinion of the plaintiff's expert, Steven A. Whyte, that an endless track would be understood to be a "wheel" by one skilled in the art, is similarly unsupported by reference to any extrinsic material. The Court thus rejects this contention.

As such, the Court attaches to the term "wheel" a modified form of its generic, dictionary meaning that excludes wheels not used for bearing the plant's weight and moving it, but includes wheels that are not merely tire-mounted. Thus, the Court construes wheel to mean: "a circular frame that has a hub at the center for attachment to or suspension from an axle, on which it revolves, and that serves to bear the weight of the screening plant."

### d. "Head articulation means"

■ Both parties request that the Court construe the term "head articulation means" ("HAM"). The term appears in claim 1, which states that the invention comprises:

> a head articulation means connecting the head section to the tail section in such a way that the head section is movable from an operative position to a transport position with the head section extending longitudinally above the chassis and positioned with respect to the input hopper and material processing means so that it does not project laterally beyond the chassis.

The parties agree that "head articulation means" is a means-plus-function claim that should be construed pursuant to 35 U.S.C. § 112, ¶ 6. The first step of the construction of this term is thus the identification of the term's function, after which the Court must identify the structures set forth in the specification that carry out this function.

The plaintiff maintains that the recited function of the HAM is to "connect[ ] the head section to the tail section in such a way that the head section is movable from an operative position ... to a transport position." (Pl.'s Opp. to Def.'s Mot. for Cl. Const. at 5.) The only structure the plaintiff identifies as necessary for carrying out this function is a "pivotal connection."

The defendant urges that the recited function of the HAM is:

> connecting the head section to the tail section in such a way that the head section is movable from an operative position to a transport position with the head section extending longitudinally above the chassis and positioned with respect to the input hopper and material processing means so that it does not project laterally beyond the chassis.

(Defs.' Mem. L. Cl. Const. at 21.) The structures the defendant claims are necessary for carrying out this function are:

> [a] pivot joint, hydraulic ram, a tapered part of the frame of the head section, along with a fixed stop mounted on the tapered part of the head section frame which abuts against a threaded adjustable stop mounted on the tail frame section, a plate through which a pin passes, the pin being welded to a holding plate which is held in position by stops on the plate, the pin having various lubrication grooves, a C-clip in the lower of a pair of wing plates welded to the tail frame, and a bushing which engages the pin and which is secured to the tapered head frame so that the pin is fixed, while the bushing rotates.

(Id. at 21.)

The Court finds that the function identified by the plaintiff fails to incorporate language that describes the full functioning of the HAM. In the Court's view, while the key verb in the relevant function is "connecting", the recited function is nonetheless connecting *in a certain manner to facilitate a named end*—namely, connecting in such a way that the conveyor can fold compactly. The Court thus adopts as the relevant function for the HAM the entirety of the paragraph that follows "head articulation means" in the patent claim, and so adopts a definition of the function as identified by the defendants. As for the structures that carry out this function, the Court finds that, while more than "a pivotal connection" is properly incorporated into the term, not all of the structures identified by the defendants need to be incorporated.

To identify the structures associated with the recited function, the Court first looks to the patent specification. Here, the specification states that:

> The pivot joint 50 together with an hydraulic ram 51 and a tapered part 52 of the frame of the head section 22 form part of the head articulation means.... [T]here is a fixed stop 53 mounted on the tapered portion 52 of the head section frame and this abuts against a threaded adjustable stop 54 mounted on the tail frame section 45. Details of the pivot joint 50 are shown in FIG. 8(b). There is a plate 60 through which a pin 60 passes, the pin 60 being welded to a holding plate 61 which is held in position by stops [61(A)] on the plate 60. The pin 62 has various lubrication grooves 63 as illustrated and is retained by a C-clip in the lower of a pair of wing plates 45(a) welded to the tail frame 45. A bushing 65 engages the pin 62 and the former is secured to the tapered head frame 52. Thus, the pin 62 is fixed, while the bushing 65 rotates. As shown in FIGS. 9(a) and 9(b), there is an elongate guard 68 for the exposed piston of the ram 51 when in the operative position and this rotates to a cover position as shown in FIG. 9(b).

('618 patent, cols. 5–6, lns. 39–41, 66–12.) This section describes in detail the "nuts and bolts" of the connection between the head section and the tail section, all of which are associated with the HAM.

The Court finds that only some of the named structures from these passages should be incorporated into the claim itself. In the Court's view, the first criteria for determining whether a structure described in the specification carries out the recited function is whether it connects the head section to the tail section. If it does, then the Court should inquire as to whether the structure connects the head section to the tail section in the way recited in the function.

Here, the "fixed stop" and the other "stops" do not connect the head section to the tail section, nor do the lubrication grooves in the pin or the C-clip. These elements are therefore not incorporated into the claim. By contrast, the pivot joint itself, the connecting pin, the bushing, the wing plates, and the holding plate all connect the head section to the tail section, and allow the head section to be folded snugly against the plant support frame. These structures are therefore incorporated into the claim. As for the "tapered part of the head section", this structure is identified in the specification as "form[ing] part of the head articulation means," but nonetheless is excluded as a part of the claim term. The head section—including the tapered part of it—is what is connected to the tail section, and does not itself do the connecting. See, e.g., Northrop Grumman Corp. v. Intel Corp., 325 F.3d 1346, 1352 (Fed.Cir.2003) (holding that a means claim with the function of "monitoring" did not incorporate the signals that were monitored). As the tapered part of the head section does not connect the head and tail sections, it is not incorporated into the HAM.

As for the hydraulic ram, this, too connects the head section to the tail section, but is not properly incorporated into the claim. While the specification describes the hydraulic ram as part of the HAM, the specification elsewhere states that "it is envisaged that there may be no drive means for the articulation of the lateral conveyors as they could be moved either manually or by help of a loader to the desired positions." Generally, when a specification sets forth alternative structures to carry out a function, each explicitly described structure is incorporated into the means-plus-function claim. *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1258 (Fed.Cir. 1999) ("Identification of corresponding structure may embrace more than the preferred embodiment. A means-plus-function claim encompasses all structure in the specification corresponding to that element and equivalent structures.").

Here, the Court views the cited language as stating that the HAM could connect the head section to the tail section *without* the hydraulic ram described elsewhere in the specification. That is, the specification sets forth a specific alternative embodiment in which no structure exists to "drive" or move the head section about the tail section. In this alternative embodiment, the hydraulic ram and its equivalents are not incorporated into the means-plus-function claim. As such, the Court does not incorporate the hydraulic ram as a necessary element of the HAM.

The plaintiff further contends that the specification provides that "[t]he invention is not limited to the embodiments hereinbefore described," and that the structures associated with the HAM should therefore not be limited to those described in the specification. However, the Court finds that this broad assertion is insufficient to overcome the general rule that a means-

plus-function claim is limited to the specific structures associated with the recited function in the specification. *See Fonar Corp. v. General Elec. Co.*, 107 F.3d 1543, 1551 (Fed.Cir.1997) (holding that a general statement that alternative structures may be used to carry out the function of a means-plus-function claim, without identifying the alternative structures, does not expand the scope of the means-plus-function claim).

Notwithstanding this general rule, the plaintiff also maintains that the only structure that should be incorporated into the HAM is "a pivotal connection," because this is the only structure "necessary" to carry out the recited function. The plaintiff appears to argue that, because the head section could be connected with the tail section using any number of structures in lieu of those described in the specification, the only structure that cannot be replaced—the "pivotal connection"— should be the only structure incorporated into the HAM.

██ This misstates the basic tenets of means-plus-function claim construction. Unlike ordinary claim construction, a means-plus-function term is construed to incorporate all of the structures described in the specification that carry out the term's function. The fact other, unnamed, structures could carry out the same function is immaterial; the named structures (and their equivalents) define the claim term. *See Nomos Corp. v. Brainlab USA, Inc.*, 357 F.3d 1364, 1368 (Fed.Cir.2004) ("a means clause does not cover every means for performing the specified function" (internal quotations omitted)). Hence, the Court incorporates into the HAM the actual structures that form the "pivotal connection" that the plaintiff identifies as essential.

The cases that the plaintiff relies on in support of its argument, *Golight, Inc. v. Wal–Mart Stores, Inc.*, 355 F.3d 1327, 1331–32 (Fed.Cir.2004), *Asyst Technologies, Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed.Cir.2001), *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1257–58 (Fed.Cir.1999), and *Northrop Grumman Corp.*, 325 F.3d at 1352, are similarly inapposite. Each of these cases stands for the proposition that structures that are superfluous or antecedent to performing a named function should not be incorporated into a mean-plus-function claim. This is not the case here, where each of the incorporated structures actually carries out the named function.

The plaintiff also argues that the HAM does not comprise, among other things, a "pivot joint", a "bushing", or a "pivot pin", because these elements are explicitly recited as part of the HAM in the patent's dependent claims. The plaintiff contends that, by incorporating these structures into claim 1, the Court would improperly collapse the dependant claims into the same definition as claim 1. The plaintiff cites to *Wenger Mfg., Inc. v. Coating Machinery Systems, Inc.*, 239 F.3d 1225, 1233 (Fed. Cir.2001), for the proposition that the doctrine of claim differentiation precludes this. *Wenger* provides that, even when interpreting means-plus-function claims, the Court should strive to interpret various claims so as to differentiate them in scope. *Id.*

Notwithstanding *Wenger*, the Court finds that the teachings of *Laitram Corp. v. Rexnord, Inc.* and *Nomos Corp. v. Brainlab USA, Inc.* control. These cases provide that "claim differentiation, which is a 'guide, not a rigid rule,' does not override the requirements of § 112, ¶ 6 when the 'claim will bear only one interpretation.'" *Nomos*, 357 F.3d at 1368 (quoting *Laitram v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir.1991) (internal quotations omitted)). Here, except for the removability of the hydraulic ram, the specification supplies

only one set of structures that perform the function of the HAM. Thus, in the Court's view, with the single exception of the hydraulic ram, the HAM will bear only one interpretation—one that incorporates these structures. The doctrine of claim differentiation does not alter this outcome.

The Court therefore construes the function of the "head articulation means" to be:

connecting the head section to the tail section in such a way that the head section is movable from an operative position to a transport position with the head section extending longitudinally above the chassis and positioned with respect to the input hopper and material processing means so that it does not project laterally beyond the chassis.

The Court finds the following structures to be necessary to carry out this function: a pivot joint, a connecting pin, a bushing, wing plates, and a holding plate. "Head articulation means" is therefore interpreted to incorporate these structures, and their equivalents.

### e. "does not project laterally beyond the chassis"

■ The defendants request that the Court construe the term "does not project laterally beyond the chassis." The term appears twice in claim 1, once at the conclusion of the "tail articulation means" limitation and once at the conclusion of the "head articulation means" limitation. In each instance, the term describes the way the lateral conveyors fold when the plant is in transport mode. That is, the conveyor folds so that it "does not project laterally beyond the chassis."

The defendants propose that this term be interpreted to mean that "no elements of the lateral conveyor extend or protrude beyond the longitudinal beams." The plaintiffs object to the replacement of "chassis" with "longitudinal beams", and further urge the Court to construe "project" to mean "to jut out: extend beyond a given line."

As discussed above, the Court construes "chassis" to encompass more than just the longitudinal beams described by the defendants. The use of "chassis" in this part of the patent must conform to the Court's construction, and the Court therefore rejects the defendants' request that "chassis" be replaced with "longitudinal beams" in the construction of "does not project laterally beyond the chassis."

With respect to interpretation of the word "project", neither party argues that this term has a special technical meaning in this context. The Court finds that the entirety of the patent, including the drawings of the preferred embodiment, belie the defendants' argument that the term "project" would admit of elements that extend, even minimally, beyond the device's chassis. Thus, the Court finds the term "does not project laterally beyond the chassis" to mean "does not extend, in any amount, laterally beyond the chassis".

### B. As to the Plaintiff's Motion to Exclude Evidence and Preclude the Assertion of New Defenses

Before addressing the parties' motions for summary judgment, the Court first addresses the plaintiff's motion to exclude certain evidence and preclude the defendants from asserting certain "new" defenses. Specifically, the plaintiff seeks to prevent the defendants from asserting (1) that the Accused Screening Plants do not infringe the '618 patent because their folded conveyors extend beyond their chasses (when "chassis" is defined as it is herein), and (2) that the '618 patent is invalid based on obviousness in view of PCT Patent Application WO 85/03652 (called "Erickson"), taken in combination with U.S. Patent No. 4,245,732 (called "Couperus"). Additionally, the plaintiff seeks to exclude

evidence relating to the distance that the conveyors of the Accused Screening Plants extend beyond their chasses when folded.

The Court denies the plaintiff's first request to preclude. The plaintiff asserts that the defendant has not previously disclosed this non-infringement defense that the conveyors of the Accused Screening Plants protrude laterally beyond their chasses when folded. However, the plaintiff's own expert, Stephen A. Whyte, stated in his report that the lateral conveyors of the Accused Screening Plants "when folded, do not project beyond the chassis or, *in the event that they do,* extend so minimally relative to the overall width of the machine as to be substantially the same as not projecting beyond the chassis." (Chang Decl., Sept. 3, 2009, Ex. 15, ¶ 34. (emphasis added)). The plaintiff's expert report thus explicitly admits of the possibility that the conveyors on the Accused Screening Plants extend past their wheel bases when folded. Moreover, the defendants' expert report openly asserts that they conveyors overhang the wheel bases this way.

In the Court's view, the plaintiff was thus sufficiently aware of this issue prior to the defendants' motion for summary judgment. Moreover, it is at all times the plaintiff's burden to prove that the accused devices contain all of the elements of the relevant patent. Here, the positioning of the lateral conveyors during transport is a key element of the '618 patent. The Court will allow the defendant to argue at summary judgment and trial that the plaintiff cannot meet its burden on this issue.

■ However, the Court grants the plaintiff's motion to preclude the defendants' new obviousness defense. The plaintiff contends that the defendants asserted for the first time in their motion for summary judgment that the '618 patent is obvious in light of the combination of the Erickson patent application and the Couperus patent. The plaintiff admits that

the defendant identified both the Erickson and the Couperus documents during discovery, but asserts that the defendants never argued prior to their motion for summary judgment that their combination made the '618 patent obvious. The defendants do not contend that they previously asserted the Couperus and Erickson combination makes the '618 patent obvious. Rather, they assert that the prior identification of these documents allows the defendants to now argue that, in combination, they render the '618 patent obvious.

■ Generally, a party can be compelled during discovery to clarify the affirmative defenses asserted in its pleadings to simplify proceedings at trial. *See, e.g., Nimkoff v. Dollhausen,* 262 F.R.D. 191, 195–96 (E.D.N.Y.2009) (Wall, MJ) (discussing the use of contention interrogatories to clarify contentions). Here, the plaintiff did request by interrogatory that the defendants clarify their obviousness defenses. The defendants responded by listing a number of patent and patent application documents, including both the Erickson and Couperus documents. Then, in their expert report, the defendants also identified in greater detail how these documents rendered the '618 patent obvious. The defendants' expert report contains several explanations of how certain documents and devices, individually and in combination, allegedly render the '618 patent obvious. One combination that the report does not contain, however, is the combination of the Erickson and Couperus documents.

The Court finds the defendants' expert report to be wide ranging in listing bases for the defendants' obviousness defense. As such, the absence of the Erickson/Couperus combination argument in this and all other documents that preceded the defendants' motion for summary judgment is notable. The defendants had every opportunity to raise obviousness defenses during

discovery and in fact did so. The Court views the defendants' failure to timely raise this particular defense as a waiver, and grants the plaintiff's motion to preclude on this issue.

■ Finally, the Court also grants the plaintiff's motion to exclude certain evidence not disclosed during discovery. In support of its motion for summary judgment, the defendants submitted to the Court an affidavit by Joseph Daly, a product engineer manager and an employee of Powerscreen, dated September 3, 2009. In this affidavit, Daly asserts that he reviewed design drawings for several of the Accused Screening Plants that were prepared using Powerscreen's computer aided design ("CAD") software. Using this software, Daly determined that the Accused Screening Plants' conveyors overhang their chasses (as defined by the plaintiff) by up to 13.3 inches. The defendants have at no time produced the drawings on which Daly relies, nor did they provide the plaintiffs with Daly's opinion on the issue until filing their summary judgment motion.

The plaintiff asserts that both the drawings on which Daly relies, and Daly's derivative opinion evidence, should be excluded at summary judgment and trial. The Court agrees. During discovery, the plaintiff requested that the defendants produce:

> all documents and things concerning the research, design, and development of defendants' Mobil Aggregate Material Processing Plants, including without limitation schematics, drawings, and blueprints.

(Stuart Decl., Aug. 13, 2009, Ex. C at 22.) In spite of this, the defendants did not produce the drawings in question, which, in the Court's view, are responsive to this request. There has been no showing that the defendants' failure was either substantially justified or harmless. Thus, the appropriate sanction under the Federal Rules of Civil Procedure is the exclusion of this evidence. Fed.R.Civ.P. 37 ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.") The Court therefore grants the plaintiff's motion to exclude the drawings of the Accused Screening Plants on which Daly relied, as well as Daly's related testimony.

Both parties have requested that the opposing party pay its attorneys' fees and expenses related to these motions to preclude and exclude. The Court declines to grant either request, and directs each party to pay its own fees and costs.

## C. As to the Parties' Motions for Summary Judgment

The plaintiff has moved for partial summary judgment seeking that the Court: (1) find that the Accused Screeners infringe the '618 patent, (2) strike all of the defendants' affirmative defenses except obviousness, and (3) dismiss all of the defendants' counterclaims. The defendants have also moved for summary judgment, requesting that the Court: (1) dismiss all of the plaintiff's claims on the basis of non-infringement, and (2) preclude the plaintiff from asserting willful infringement and enhanced damages.

The Court finds there are some genuine issues of material fact with respect to the plaintiff's motion for summary judgment, and therefore grants in part and denies in part the plaintiff's motion for summary judgment pursuant to Fed.R.Civ.P. 56(d)(1), which provides:

> If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue.

The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts—including items of damages or other relief—are not genuinely at issue. The facts so specified must be treated as established in the action.

Finding genuine issues of material fact on all issues with respect to the defendants' motion for summary judgment, the Court denies the defendants' motion in its entirety.

### 1. Legal Doctrine

It is well-settled that summary judgment under Fed.R.Civ.P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" within the meaning of Fed.R.Civ.P. 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted).

To prevail on a summary judgment motion in the patent infringement context, the defendants must show that a reasonable trier of fact could not find that the accused devices infringe every element of a claim or its substantial equivalent. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed.Cir.1997). Generally, literal infringement and infringement by the doctrine of equivalents is an issue of fact for the jury. *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1373 (Fed.Cir.2006). However, a Court should grant summary judgment where no reasonable fact finder could find equivalence. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed.Cir.1997). With respect to infringement under the doctrine of equivalents, the Supreme Court has declined to articulate specific language to define the doctrine, stating instead:

> An analysis of the role played by each element in the context of the specific patent claim will [ ] inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element.

*Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

### 2. As to Infringement

The Court first addresses the issue of infringement with respect to both parties' motions for summary judgment. To prevail on its own motion for summary judgment, the plaintiff must show that the accused devices contain all elements of the claim at issue. By contrast, the defendants will prevail by showing that even a single element is not incorporated into the accused devices. The defendants contend that there are three issues that preclude a finding of infringement and warrant a finding of non-infringement. Namely, the defendants claim that:

(1) the lateral conveyors of each and every Accused Screening Plant project laterally beyond the chassis of that plant when in the transport position;

(2) none of the Accused Screening Plants has the head articulation means claimed in the '618 patent; and

(3) Accused Screening Plants with a chassis mounted on tracks do not have a "wheel mounted" chassis and are not "mobile, road-hauled."

The plaintiff contests each of these **contentions**, and **asserts** that all of these elements are incorporated into the Accused Screening Plants, thus warranting a finding of infringement.

### a. As to Whether the Accused Screening Plants Contain Conveyors that "Project Laterally Beyond the Chassis" When in Transport Mode

■ The defendants argue that the Accused Screening Plants "project laterally beyond the chassis" because they project beyond the "longitudinal beams" that they maintain define the term "chassis". As the Court has rejected this construction in favor of a construction of "chassis" to mean "the entire assembly of parts that rest beneath the plant support frame," this argument fails.

The defendants also claim that, even if "chassis" is interpreted as the Court has done, the Accused Screening Plants do not infringe the '618 patent because their lateral conveyors extend beyond the wheel base and associated parts of the screeners when in transport mode. The plaintiff has moved to preclude the defendants from asserting this argument, but, as discussed above, that motion is denied. However, also as discussed above, the Court has precluded the defendants from relying on evidence derived from certain design drawings of the Accused Screening Plants that were not produced in discovery.

The Court finds that, even with the preclusion of certain of the defendants' evidence, there is a genuine issue of material fact with respect to whether the lateral conveyors of the Accused Screening Plants literally infringe this element of the '618 patent. The plaintiff's expert, Steven A. Whyte, has stated that his observations and measurements demonstrate that the lateral conveyor arms of the accused screeners do not extend beyond the chassis when in transport mode, and has appended photographs that appear to support this opinion. (Whyte Decl., ¶ 23, Ex. 2, photos 18–21.) As discussed above, however, Whyte admits of the possibility that the conveyors do in fact protrude beyond the chassis, and the defendants' expert claims the same. Thus, there is a genuine issue of material fact with respect to this issue.

The plaintiff nevertheless argues that, even if the conveyors on the Accused Screening Plants do extend beyond their chasses when folded, the plaintiff is entitled to summary judgment under the doctrine of equivalents. According to the plaintiff, there is no genuine issue as to the fact that, if the conveyors protrude beyond

their chasses, they protrude so minimally as to infringe the relevant term by equivalents. The defendants urge just the opposite, insisting that, if the conveyors on the Accused Screening Plants that protrude any amount, they cannot as a matter of law be equivalent to a term that requires that the conveyors "do not" protrude beyond the chassis when in transport position.

As a general matter, infringement—especially by equivalency—is an issue of fact for the jury. *Cook Biotech,* 460 F.3d at 1373. Here, taking the evidence in the best light for the defendants and resolving all ambiguities in their favor, the Court finds that the plaintiff is not entitled to summary judgment with respect to infringement by equivalents on this issue. The defendants' expert, Frank J. Loeffler, has opined that the lateral conveyors of the Accused Screening Plants extend beyond their chasses in a way that fails to solve the problems solved by the '618 patent. The Court finds this sufficient to raise a material issue of fact as to whether the Accused Screening Plants infringe this important element of the '618 patent by equivalents.

Conversely, the Court also finds that the defendants are not entitled to summary judgment on this issue, either. The defendants argue that a plant whose conveyors extend beyond its chassis—even minimally—cannot infringe by equivalents the element here that describes the conveyor as "not" extending beyond the chassis. The defendants analogize this case to *Moore U.S.A., Inc. v. Standard Register Co.,* 229 F.3d 1091, 1106 (Fed.Cir.2000), a case concerning a patent for envelopes with adhesive strips, wherein the adhesive strip was described as extending "a majority" of the length of the relevant envelope. In *Moore U.S.A.,* the Federal Circuit held that this claim term would not be extended by the doctrine equivalents to cover similar envel-opes whose adhesive strips extended only 48% of their length. The defendants argue that, just as in *Moore U.S.A.* there was a binary difference between adhesive strips that extend a majority of the length of the envelope and those that do not, there is here similarly a binary difference between conveyors that extend beyond the chassis and those that do not.

The defendants contend that their argument is supported by the fact that the '618 patent describes a relatively simple device. According to the defendants, the patentee could easily have used alternative language to cover conveyors that protruded only minimally beyond the chassis, but chose not to. Thus, the defendants assert, the claim term must be limited to conveyors that do not extend beyond the chassis of the device.

The Court agrees that the relevant description in the '618 patent is relatively simple. However, there is evidence that a device whose conveyors project only minimally beyond the chassis would operate in all material functions the same as one whose conveyors do not. To construe the patent as strictly as the defendants urge would provide would-be infringers with a simple roadmap for evasion. Avoiding this is in fact a primary basis for the doctrine of equivalents itself. In the Court's view, the edge of the chassis serves as a practical linguistic reference point to describe one of the desired functions of the plant—namely, that it fold compactly. The fact that the conveyors strictly remain within the chassis is not necessarily an essential part of the design.

While *Moore U.S.A.* has similar facts to the present case, the Court views it as distinguishable because, in *Moore U.S.A.,* the court also relied on the doctrine of claim vitiation to limit the doctrine of equivalents. The doctrine of claim vitiation states that, if applying the doctrine

of equivalents would essentially eliminate a claim limitation, then the doctrine of equivalents should not be applied. In *Moore U.S.A.*, the court held that to allow adhesive strips that extended a "minority" of the length of the envelope to be equivalent to those that extend a "majority" of the length would vitiate the term "majority." 229 F.3d at 1106. Here, however, even if minimally protruding conveyors were deemed to be equivalent to non-protruding conveyors, the term "does not project laterally beyond the chassis" would still limit the patent. It would do so in the sense that the term would be read to require that the conveyors not *materially* protrude beyond the chassis. To be sure, the patentee could have included the word "materially", but did not. Nevertheless, the Court finds that, on balance, a reasonable jury could find that the Accused Screening Plants could infringe this claim term by equivalents.

Finally, the defendants contend that the plaintiff is estopped from arguing infringement by equivalents in this context, based on the prosecution history of the '618 patent. The defendants assert that, in prosecuting the '618 patent, the patentee amended the patent " 'to more clearly indicate' the transport position as 'having no elements extending laterally of the chassis.' " (Defs.' Resp. to Pl.'s Mot. for Sum. J. at 8 (quoting Yankwitt Decl. Ex. D at MP000086).) According to the defendants, the doctrine of prosecution estoppel provides that, upon making such amendments, the plaintiff relinquished its right to later claim infringement of this term by equivalents.

■ The Court finds that this argument is without merit. Generally, the doctrine of prosecution estoppel applies only to claim limitations that were added during prosecution to render a device patentable. *See Conoco, Inc. v. Energy & Environmental Intern., L.C.*, 460 F.3d 1349, 1363–

64 (Fed.Cir.2006). Here, the original patent application for the '618 patent included the text in question. That is, the application provided that the conveyor "does not project laterally beyond the chassis" when in transport mode. At no time did the plaintiff amend the patent to add or modify this language. Further, there is no indication that "the prosecution history [ ] evince[s] a clear and unmistakable surrender of subject matter" with respect to equivalents of the claim term in question. *Id.* (internal citations and quotations omitted). Thus, the Court denies summary judgment to both parties on the issues of both literal infringement and infringement by equivalents with respect to this claim term.

**b. As to Whether the Accused Screening Plants Contain the "Head Articulation Means" Described in the '618 Patent.**

■ As discussed above, "head articulation means" is a means-plus-function claim element. Under Section 112 ¶ 6, this element literally encompasses both the structures incorporated into the claim and those structures' equivalents. For a structure to infringe a means-plus-function claim element, the structure must both carry out the recited function of the element (or its equivalent), and contain the structures incorporated into the element (or their equivalents). *See Al–Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1320–21 (Fed.Cir.1999).

The defendants argue that the Accused Screening Plants do not infringe the '618 patent because the plants' head articulation means do not include (1) a tapered part of the head section, (2) a C-clip, (3) a threaded adjustable stop, (4) a fixed stop, (5) or a hydraulic ram that connects the head section to the tail section. However, the Court has construed "head articulation

means" as not incorporating any of these elements, and therefore the defendants' argument fails. The defendants do not contest that the Accused Screeners contain all of the structural elements, or the equivalents thereof, that the Court has construed as incorporated into the HAM. As such, there is no genuine issue of material fact with regard to whether the Accused Screening Plants contain all of the elements, or their equivalents, that are incorporated into the HAM. The Court therefore grants the plaintiff's motion for summary judgment with respect to this fact, and it is to be taken as true at trial. Fed.R.Civ.P. 56(d)(1).

The defendants nonetheless contend that the Accused Screening Plants do not infringe the "head articulation means" limitation of the '618 patent because the conveyors in the Accused Screening Plants "protrude laterally beyond the chassis" when folded. The defendants point out that it is the function of the HAM to connect the head and tail sections such that, when folded, the conveyor "does not protrude laterally beyond the chassis." The plaintiff argues, as above, that summary judgment is appropriate in its favor because the lateral conveyors of the Accused Screening Plants do not protrude beyond their chasses, or they protrude so minimally as to be equivalent to those that do not protrude.

The Court agrees that it is the function of the HAM to connect the head and tail sections such that the conveyors do not protrude laterally beyond the chassis when folded. As discussed above, the Court also finds that there are genuine issues of material fact with respect to whether the conveyors of the Accused Screening Plants extend beyond the chassis when folded. There are also genuine issues of fact as to whether conveyors that protrude minimally beyond the chassis may be deemed equivalent to those that do not. Thus,

while there is no genuine issue of material fact as to whether the structures of the HAM are present in the Accused Screening Plants, there is a genuine issue of material fact as to whether these structures carry out the recited function of the HAM or its equivalent. Thus, except as described above, the Court therefore denies both parties' motions for summary judgment with respect to this issue.

**c. As to Whether the Accused Screening Plants Mounted on Tracks are "Mobile, Road–Hauled" and have "Wheel Mounted Chasses"**

The parties agree that a number of the Accused Screening Plants are mounted on tracks, as opposed to being mounted on wheels with tires on them. The defendants contend that these devices do not infringe the '618 patent as a matter of law because they are not "mobile, road-hauled", and they do not have "wheel mounted chasses." The plaintiffs assert the opposite, and seek summary judgment on this issue in their own favor.

The Court first addresses the issue of whether the track-mounted screeners are "mobile, road-hauled". The defendants assert that the track-mounted screeners are not "mobile, road-hauled", because they are not capable of being hauled on a road without the use of an additional trailer that comprises its own set of wheels. However, as discussed above, the Court has construed "mobile, road-hauled" to mean "capable of being hauled over long distances on a road, with or without other devices." The defendants do not contest, and in the Court's view, there is no basis to contest, that the track-mounted screeners in question meet this definition of "mobile, road-hauled". Thus, the Court finds there is no genuine issue of fact with respect to whether the track-mounted screeners in question are "mobile, road-hauled."

The defendants also argue that the track-mounted screeners do not have "wheel mounted chasses." According to the defendants, the definition of "wheel" does not encompass "tracks", either literally or by equivalent, and thus the track-mounted screeners are not "wheel mounted". To the contrary, the plaintiff argues that the track-mounted screeners have chasses that are nonetheless "wheel mounted", because the chasses are mounted on a number of wheels that drive and guide the track parts that come into contact with the ground.

The Court finds that this is most appropriately a question for the jury. In the Court's view, there are material issues of fact with respect to how the tracks operate and what role their wheels play in their functioning. As such, the Court denies summary judgment to both the plaintiff and the defendants with respect to the issue of whether the track-mounted screeners have "wheel mounted chasses".

### d. As to the Remaining Infringement Issues

The defendants do not contest that the Accused Screening Plants contain the other elements of claim 1 of the '618 patent. Thus, based on this admission and on the opinion of the plaintiff's expert, Steven A. Whyte, the Court finds there are no genuine issues of material fact with respect to infringement of the rest of the elements of claim 1 of the '618 patent, and grants summary judgment in the plaintiff's favor on this issue.

### D. As to the Remaining Issue in the Defendants' Motion for Summary Judgment

In addition, the Defendants request that that Court preclude the plaintiff from claiming willful infringement and enhanced damages "because Defendants' [sic] have asserted reasonable defenses." (Defs.' Mot. Sum. J. at 55.) As the defendants have offered virtually no argument or law in support of this request, the Court denies this motion by the defendants.

### E. As to the Remaining Issues in the Plaintiff's Motion for Summary Judgment

In addition, the plaintiff moves for summary judgment on the following issues: (1) the plaintiff's alleged lack of standing to sue, (2) whether the plaintiff failed to properly mark its screeners with identifying patent information, (3) the defendants' affirmative defenses of failure to state a claim and lack of personal jurisdiction over PSNY, (4) the validity of the defendants' reservation of the right to assert additional affirmative defenses, (5) dismissal of the defendants' invalidity claims under 35 U.S.C. §§ 101, 102, and 112, (6) dismissal of the defendants' claim that the plaintiff failed to name the correct inventor on the '618 patent, (7) dismissal of the defendants' inequitable conduct claim, and (8) dismissal of the defendants' laches claim.

In response, the defendants have withdrawn: (a) their affirmative defense of failure to mark, (b) their affirmative defense of failure to state a claim, (c) their affirmative defense of lack of personal jurisdiction over PSNY, and (d) their affirmative defenses of invalidity under 35 U.S.C. § 101. The defendants have not addressed their general defense of invalidity under 35 U.S.C. § 102 except in the context of failure to name the proper inventor, nor have they addressed the reservation of the right to assert new affirmative defenses. The defendants oppose the remainder of the plaintiff's motion.

### 1. As to the Plaintiff's Standing to Sue

The defendants have asserted in their counterclaim that the plaintiff lacks standing to sue on the '618 patent because the

plaintiff does not have good title to the patent. The plaintiff argues there are no genuine issues of material fact with respect to this claim, and that it should therefore be dismissed. The Court agrees.

The plaintiff has explained the chain of title of the '618 patent as follows: Malachy Rafferty was the original patentee, and thus held title to the patent when it was issued in 1996. In 1999, Rafferty then sold the patent to the plaintiff (then organized under a different name), who continues to hold the title. The defendants claim that the plaintiff lacks good title because, under United Kingdom law, the proper title to the '618 patent was held by Rafferty's employer, Masterskreen. Thus, Rafferty's sale of the patent title to the plaintiff in 1999 was invalid, because Rafferty had no title to sell. According to the defendants, the plaintiff's title to the '618 patent is therefore defective.

However, apparently aware of this issue, Masterskreen (now operating under a new name) executed a quitclaim deed for the '618 patent in favor of the plaintiff on March 27, 2006, two days before the plaintiff filed the present suit. (Yankwitt Decl., Ex. 36.) Thus, even if Masterskreen, rather than Rafferty, was the true holder of the '618 patent in 1999, the March 27, 2006 quitclaim transfer cured any defect in title.

The defendants also argue that Rafferty did not have proper title to the '618 patent because he failed to name Richard Byrne as the sole inventor or co-inventor of the subject matter of the '618 patent. As discussed below, the defendants asserted a similar argument in the context of the law pertaining to inventorship and inequitable conduct. For the reasons set forth below, the Court rejects the defendants' arguments on this issue. The Court thus grants summary judgment in favor of the plaintiff with regard to the issue of standing.

## 2. As to the Defendants' Invalidity Defense Based on 35 U.S.C. § 102

In their answers, the defendants generally asserted the invalidity of the '618 patent based on 35 U.S.C. § 102. The plaintiff has moved to dismiss this defense.

 Generally, patents are presumed valid. 35 U.S.C. § 282. At the summary judgment phase, a defendant who claims invalidity must therefore "come forward with evidence that, if credited, could satisfy" the clear and convincing evidence standard required to show a patent to be invalid. *System Management Arts Inc. v. Avesta Technologies, Inc.*, 87 F.Supp.2d 258, 263 (S.D.N.Y.2000). Here, and as discussed in part below with respect to 35 U.S.C. § 102(f), the defendants have not pointed to evidence that would support a finding of invalidity under 35 U.S.C. § 102, and the Court therefore grants summary judgment in the plaintiff's favor with regard to Section 102.

## 3. As to the Defendants' Invalidity Defense Based on 35 U.S.C. § 112

The defendants contend that, "if . . . this Court accepts Plaintiff's proposed claim construction that would expand the asserted claims of the '618 patent to screening plants with a track mounted chassis, then, as a matter of law, the asserted claims would be invalid under Section 112, paragraph 1 [which requires a written description of the invention]." (Defs.' Resp. to Pl.'s Mot. for Sum. J.) The defendants contend that, because there is no mention of "tracks" in the written description of the patent, the patent's description would be fatally insufficient if it encompassed track-mounted screeners.

 The Court finds this argument by the defendants to be without merit. There is no requirement that a patent specification describe every embodiment of the pat-

ented device. The only law to which the defendants cite, *ICU Medical, Inc. v. Alaris Medical Systems, Inc.*, 558 F.3d 1368, 1377 (Fed.Cir.2009) stands for the general proposition that a failure to sufficiently describe an invention results in invalidity. Here, the Court is satisfied that the patent specification fully describes the preferred embodiment of the invention. The fact that the patent might encompass other embodiments—including devices with endless track elements—does not alter this conclusion that the full-description requirement has been met. The Court therefore grants the plaintiff's summary judgment motion dismissing the defendants' affirmative defense of invalidity under 35 U.S.C. § 112.

### 4. As to the Defendants' Reservation of the Right to Assert Additional Defenses

The defendants have asserted as one of their affirmative defenses the right to assert additional, unnamed affirmative defenses. The plaintiff has moved to strike this "affirmative defense." The Court finds the issue not ripe for adjudication, as the defendants are not currently seeking to amend their answers to assert additional affirmative defenses. The Court therefore declines to rule on the issue.

### 5. As to the Defendants' Counterclaim that the '618 Patent Improperly Fails to Name Richard Byrne as an Inventor

The defendants assert that the '618 patent is invalid because a former employee of Masterskreen, Richard Byrne, was either an unnamed co-inventor or the unnamed sole inventor of the device described in the '618 patent. If the defendants assertion is accurate, this would be a basis under 35 U.S.C. § 102(f) for invalidating the '618 patent. The plaintiff denies that Byrne was either a co-inventor or the sole inventor of the '618 patent subject matter, and

moves for summary judgment on this claim.

At the time Rafferty applied for the '618 patent, Byrne was working for Rafferty as an engineer at Masterskreen. Byrne, who now works for a subsidiary of defendant Terex, asserts that he, and not Rafferty, conceived of the '618 subject matter. Byrne thus maintains that he should have been named on the patent. The plaintiff argues by contrast that Byrne did no more than execute Rafferty's conceptual design of the invention, and that Rafferty is the true inventor.

 Under Federal Circuit law, a party challenging the inventorship of an issued patent must prove that the named inventor was not the true inventor by clear and convincing evidence. *See, e.g., Eli Lilly and Co. v. Aradigm Corp.*, 376 F.3d 1352, 1357 (Fed.Cir.2004). The Federal Circuit has stated that "the case law is unequivocal that an [putative] inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof." *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed.Cir. 1993). Thus, even when a witness claims to have been the true inventor of a disputed patent, the patent holder is entitled to summary judgment denying this claim unless the challenging party produces evidence that corroborates the witness's allegation. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed.Cir.1998).

Here, Byrne's testimony is not corroborated by any other witnesses. However, the defendants argue that Byrne's testimony is corroborated by drawings of the '618 subject matter that he prepared and signed, as well as the logbooks he kept of his work while at Masterskreen. The plaintiff disputes these contentions. The plaintiff asserts that these drawings show that Byrne drew elements of the subject

matter of the '618 patent, but that they do not indicate whether or not Byrne invented the subject matter. According to the plaintiff, Byrne admitted as much in his deposition by testifying that "[o]nly [his] testimony" would show that he in fact invented the subject matter depicted in his logbooks. (Byrne Depo. at 190:17.)

▮ Generally, one who assists an inventor in executing his conceptual design by applying ordinary skill in the art is not a co-inventor. *See, e.g., Sewall v. Walters,* 21 F.3d 411, 416 (Fed.Cir.1994). Here, Byrne worked as an engineer for Rafferty, and the fact that Byrne executed signed drawings is not inconsistent with Rafferty being the true inventor of the '618 subject matter. The Federal Circuit has repeatedly cautioned against crediting the uncorroborated testimony of a person who, after the fact, claims to have been the true inventor of a device. *Price,* 988 F.2d at 1194. Here, to allow Byrne to use his drawings to corroborate his claims to inventorship would, by extension, mean that draftsmen could generally rely on their drawings for that purpose. Thus, for a whole class of people generally involved in the development of new devices, a valid claim to inventorship could be asserted with nothing more than the draftsman's testimony and his drawings completed at the direction of a superior. The Court finds this to be inconsistent with the general rule the Federal Circuit has articulated on this issue. In the Court's view, the drawings on which the defendants rely are not sufficiently independent of Byrne's testimony to satisfactorily corroborate it. *See Ethicon, Inc. v. U.S. Surgical Corp.,* 135 F.3d 1456, 1461 (Fed.Cir.1998) (citing *Knorr v. Pearson,* 671 F.2d 1368, 1373 (C.C.P.A.1982) ("[S]ufficient circumstantial evidence of an independent nature can satisfy the corroboration rule.")).

The defendants nevertheless argue that discovery issues with respect to the drawings and logbooks themselves create issues of fact with respect to inventorship. While the plaintiff produced four large scale drawings of the '618 subject matter that Byrne completed while at Masterskreen, the defendants assert that there are at least three other similar large scale drawings that the plaintiff did not produce. The plaintiff also did not produce any of the logbooks that the defendants claim Byrne kept while at Masterskreen. The plaintiff does not admit that these documents ever existed, but also asserts that, if they did, they were destroyed in the normal course of business before litigation was commenced. The defendants state that, at best, this explanation is suspicious.

While this dispute over the production of documents gives the Court some pause, the Court finds that it is ultimately inapposite to the analysis above. Even had the plaintiff produced all of the drawings and logbooks the defendants claim existed, Byrne's own testimony was that these items would not have indicated whether or not Byrne was the originator of the ideas depicted. Thus, the Court grants summary judgment in favor of the plaintiff on this issue, and dismisses the defendants' inventorship invalidity claim.

### 6. As to the Defendants' Counterclaim of Inequitable Conduct

The defendants have asserted that the plaintiff acted inequitably in the prosecution of the '618 patent by failing to disclose to the Patent and Trademark Office ("PTO") (1) that Richard Byrne was the true inventor of the subject matter, and (2) the existence of three devices sold in the United States at the time of application that were properly "prior art" for the '618 patent. As discussed above, the Court finds there are no triable issues of fact with respect to whether Richard Byrne is the true inventor of the subject matter of

the '618 patent. However, with respect to the plaintiff's alleged failure to disclose prior art, the Court does find issues of fact.

Generally, "[a] patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution." *Digital Control, Inc. v. Charles Mach. Works,* 437 F.3d 1309, 1313 (Fed.Cir.2006) (citing *Norian Corp. v. Stryker Corp.,* 363 F.3d 1321, 1330–31 (Fed.Cir.2004)). Thus, "[t]o successfully prove inequitable conduct, the accused infringer must present evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1365 (Fed.Cir.2008) (internal quotations and citations omitted).

Here, the defendants allege that, at the time of the filing of the '618 patent application, the patentee failed to inform the PTO of the existence of three devices: the Masterstock 70, the Masterstock 80, and the Dominator. The parties agree that each of these devices is a screening plant with elements in common with the '618 patent. Further, the plaintiff does not deny that the patentee failed to disclose these screeners to the PTO. Rather, the plaintiff asserts, first, that the Masterstock 70 and 80 screeners were subsumed by another device that the patentee did disclose, and that they therefore were not required to be disclosed to the PTO. As for the Dominator, the plaintiff contends that no Dominator was sold in the United States prior to the '618 filing, and therefore it was similarly unnecessary to disclose it to the PTO under the relevant law.

The Court finds that there is no issue of triable fact with respect to the disclosure of the Masterstock 70 and Masterstock 80 screeners. Generally, "a withheld otherwise material reference is not material if it is merely cumulative to, or less relevant than, information already considered by the examiner." *Larson Mfg. Co. of South Dakota, Inc. v. Aluminart Products Ltd.,* 559 F.3d 1317, 1327 (Fed.Cir.2009). Here, the only relevant element that the defendants contend is shared by the Masterstock screeners and the '618 patent is the hinge design for the lateral conveyors. (Defs.' Resp. to Pl. Mot. Summ. J. at 19.) However, the defendants admit that this hinge design is also present in U.S. Patent No. 3,444,987, which the patentee did disclose to the PTO. (Defs.' Resp. to Pl.'s Rule 56.1 Stmt., ¶ 315.) As such, disclosure of the Masterstock 70 and 80 devices would have been cumulative of the already-disclosed '987 patent. The failure to disclose the Masterstock screeners was therefore not material, and their omission does not affect the validity of the '618 patent.

As for the omission of the Dominator, the plaintiff primarily asserts that the patentee was not obligated by law to disclose the existence of the Dominator because, during the relevant time period, it was sold exclusively overseas. The defendants agree with this basic statement of the law, but contend that at least one Dominator was sold in the United States during the relevant time period.

Generally, a patentee is not obligated to disclose an otherwise relevant device if the device was not sold in the United States more than a year before the '618 patent application was filed. *See* 35 U.S.C. § 102(b). Here, the '618 patent was filed on September 7, 1994, so the relevant issue is whether any Dominator

screener was sold in the United States prior to September 7, 1993.

The defendants assert that an invoice to "Masterskreen Chicago" for a Dominator, dated May 27, 1993, proves that a Dominator was sold in the United States prior to September 7, 1993. The plaintiff does not deny the existence of the invoice, but makes two responses. First, the plaintiff points out that the invoice in question was addressed to "Masterskreen International, Ltd., c/o Masterskreen Chicago, Chicago, IL." (Yankwitt Decl., Ex. G, MN000207.) At the time of the invoice, the Dominator was manufactured and sold by Masterskreen International, Ltd. The plaintiff argues that the sale recorded by this document was from Masterskreen International to itself, and only "care of" Masterskreen Chicago. In short, this was a transfer of assets rather than a "sale" for purposes of Section 102(b). Second, the plaintiff asserts that the invoice reflects a shipping date of May 1993, and that given the remoteness of the manufacturing facilities for the Dominator in the United Kingdom, it is likely that the machine did not arrive at its destination in the United States until after September 7, 1993.

The Court finds that there are genuine issues of fact with respect to whether a Dominator was sold in the United States before September 7, 1993. First, the name on the invoice in question is ambiguous, and taking it in the best light for the non-moving party, the Court finds that a reasonable jury could infer that the Dominator was purchased by Masterskreen Chicago, and that Masterskreen Chicago is a separate entity from Masterskreen International, Ltd. Second, there are nearly three and a half months between the invoice date and September 7, 1993. Even given the claimed remoteness of the manufacturing plants for the Dominator, the Court finds that a reasonable jury could infer from this invoice that a

Dominator arrived at its destination in the United States before September 7, 1993. The Court also finds that a reasonable jury could infer from the totality of the evidence that, if the patentee was aware of the pre-September 1993 sale of at least one Dominator in the United States, the exclusion of the Dominator as "prior art" was intentional. The Court therefore denies the plaintiff's motion for summary judgment with respect to this issue.

### 7. As to the Defendants' Counterclaim/Defense of Laches

The defendants assert that the doctrine of laches should be applied in this case to limit the plaintiff's recovery, if any, to damages from sales after the lawsuit was commenced. The defendants state that they began selling the Accused Screening Plants in the United States in 2000, and that despite the plaintiff's knowledge of this, the plaintiff did not file the present suit until 2006. The defendants assert that during this time, the plaintiff lost and destroyed files relevant to the litigation, and that this materially prejudiced them. The plaintiff states that any document destruction during this period was routine and immaterial, and that much of the delay in filing suit was due to settlement negotiations.

The Court finds that summary judgment on this issue is inappropriate. Generally, "[t]o prove laches, a defendant must show that the plaintiff delayed filing suit an unreasonable and inexcusable length of time after the plaintiff knew or reasonably should have known of its claim against the defendant; and ... the delay resulted in material prejudice or injury to the defendant." *Wanlass v. General Elec. Co.*, 148 F.3d 1334, 1337 (Fed.Cir.1998) (internal quotations and citations omitted). Here, even considering settlement negotiations, the period between discovery of the

340

alleged infringement and the filing of suit is significant. Further, the plaintiff admits to having permitted the destruction in 2005 of the entirety of the patent prosecution file held by the U.S. attorney who filed the '618 application. While the plaintiff claims that all of the documents in this file were duplicates of those held by others, the Court finds that the destruction of this file alone raises genuine issues of fact with respect to the defendants' assertion of laches. The Court therefore denies the plaintiff's summary judgment motion with respect to this issue.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the plaintiff's motion to preclude and exclude is granted in part and denied in part as set forth in this decision; and it is further

**ORDERED** that the plaintiff's motion for summary judgment is granted in part and denied in part as set forth in this decision; and it is further

**ORDERED** that the defendants' motion for summary judgment is denied in its entirety; and it is further

**ORDERED** that the parties shall file a joint pre-trial order with the Court consistent with the Court's individual practices by March 8, 2010, and it is further

**ORDERED** that the parties shall appear by telephone for a final pre-trial conference before United States Magistrate E. Thomas Boyle on Thursday, March 11, 2010, at 11:00 a.m., and shall appear for a final pre-trial conference before this Court on Monday, March 15, 2010 at 9:00 a.m.

**SO ORDERED.**